HARRIS v. STATE



 

 
 
 
 
 
 Skip to Main Content
 Accessibility Statement
 
 
 
 
 
 Help
 Contact Us
 
 
 
 
 e-payments
 Careers
 
 
 
 
 
 
 
 
 
 
 
 Home
 Courts
 Decisions
 Programs
 News
 Legal Research
 Court Records
 Quick Links
 
 
 
 
 
 OSCN Found Document:HARRIS v. STATE

 

 
 



 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 

 
 HARRIS v. STATE
2019 OK CR 22
450 P.3d 933
Case Number: D-2014-153
Decided: 09/26/2019
DONNIE L. HARRIS, JR., Appellant v. THE STATE OF OKLAHOMA, Appellee.
Cite as: 2019 OK CR 22, 450 P.3d 933

 

  
 

 O P I N I O N
 

 
 KUEHN, VICE PRESIDING JUDGE:
 
 
 ¶1 Appellant, Donnie Lee Harris, was charged in the District Court of LeFlore County, Case No. CF-2012-113, with Felony Murder in the First Degree (21 O.S.2011, § 701.7(B)). The State sought the death penalty, and alleged two statutory aggravating circumstances in support thereof: (1) that the murder was especially heinous, atrocious, or cruel; and (2) that Appellant knowingly created a great risk of death to more than one person. 21 O.S.2011, § 701.12(2), (4). Jury trial was held December 9 through 18, 2013 before the Honorable Jonathan K. Sullivan, District Judge. The jury rejected several lesser forms of homicide as alternatives to the charge, found Appellant guilty of First Degree Murder, found both aggravating circumstances, and imposed a sentence of death. Formal sentencing was held February 12, 2014.
 
 SUMMARY OF THE TRIAL PROCEEDINGS
 
 ¶2 Appellant was convicted of killing his girlfriend, Kristi Ferguson, by intentionally dousing her with gasoline and setting her on fire. The couple had been in a tumultuous relationship for several years. Late on the evening of February 18, 2012, Appellant and Ferguson showed up at the home of Martha Johnson in Talihina. Appellant lived with his father, brother, and others in a home near Johnson's. Johnson and her son testified that Ferguson, nearly naked, was screaming for help on their front porch. Part of her bra was melted to her chest. The Johnsons smelled gasoline and burned flesh. As they waited for an ambulance to arrive, Appellant repeatedly tried to keep Ferguson from talking, saying things like, "Shut the fuck up. Shut your fucking mouth. Just shut your fucking mouth. You're going to get me in fucking trouble. Don't say another fucking word." Ferguson was heard to say, "Donnie, look at me. Look what you did to me," to which Appellant replied, "I know."
 
 ¶3 Emergency personnel also testified that Appellant tried to keep Ferguson from telling them what happened. The paramedics repeatedly asked Appellant to get out of their way as they attended to Ferguson. As Ferguson was carried to the ambulance, Appellant ran alongside, repeatedly exclaiming that he was sorry, that he loved her, and "We took it too far." Once Ferguson was secured inside the ambulance and away from Appellant, she said, "I don't want him in here. Keep him away from me. Keep him away from me. Don't let him near me. He did this to me. ... He threw kerosene on me and set me on fire."
 
 ¶4 After the ambulance left, Appellant walked to the home of his friend, Melvin Bannister. (At trial, Bannister testified that Appellant said he had gotten into a fight with Ferguson, and that some candles caught their house on fire.) When police made telephone contact with Appellant, he initially refused to reveal his location, but eventually agreed to be transported to the police station for an interview. Several witnesses said that Appellant reeked of gasoline; he had a serious burn to his left hand. A lighter was found in his pocket, although he later told a detective that he did not smoke.
 
 ¶5 Appellant gave authorities vague and inconsistent accounts of what happened.[1] On February 19, 2012, after a brief discussion with Talihina Police Officer Justin Klitzke, Appellant had a more extensive interview with State Fire Marshal Agent Tony Rust, who had been dispatched to investigate the fire. Appellant told Klitzke that he kept a Crown Royal bottle of gasoline on a table in his bedroom, but said he had no idea how the fire started. Appellant wrote a four-page account of what happened for Agent Rust where he claimed that while he and Ferguson were in his bedroom, a fire of unknown origin broke out "in an instant," and quickly "jumped to a blaze" on Ferguson's clothes. When Rust told Appellant he did not believe that account, Appellant exclaimed, "I didn't splash gasoline on her and set her on fire."
 
 ¶6 On February 24, 2012, Appellant was interviewed by LeFlore County Investigator Travis Saulsberry. That interview was recorded and played for the jury at trial. He volunteered to Saulsberry (as he had to Officer Klitzke) that he kept a Crown Royal bottle full of gasoline on a table in his bedroom. Appellant maintained that he did not know how the fire started. However, from the beginning, he conceded that the gasoline-filled bottle played a part. Initially he theorized that Ferguson may have kicked the bottle off of the table. When directly confronted about how the fire started, Appellant offered various possible scenarios. Almost in the same breath, he claimed that it might have been caused by candles or a faulty space heater, but he later said there were no lit candles in his bedroom at the time. When confronted with Melvin Bannister's claim that he had blamed the fire on candles, Appellant denied making such a claim. When confronted with a recording of Bannister's statement to that effect, Appellant replied that he "didn't know what else to say." At one point he told Saulsberry, "I don't know how it happened." Still later, Appellant claimed that Ferguson actually grabbed the Crown Royal bottle full of gasoline and "threw it down," causing the bed to catch fire. Appellant accused every other witness of being untruthful or mistaken.[2]
 
  
 
 ¶7 Because firefighters had to return to the scene several times to put out "hotspots," Agent Rust was unable to safely inspect it until a few days after the fire. He collected pieces of a Crown Royal bottle found in the debris and sent this evidence, along with clothing Appellant was wearing at the time of his arrest, to the Oklahoma State Bureau of Investigation for analysis. According to OSBI Criminalist Brad Rogers, the pieces of the bottle contained traces of an ignitable fluid such as gasoline.
 
  
 
 ¶8 Ferguson was eventually flown to Oklahoma City for treatment of second- and third-degree burns over fifty percent of her body. She also suffered other fire-related trauma such as lung damage. She succumbed to her injures a few weeks later. The burn patterns on her skin were consistent with those made by a liquid accelerant such as gasoline. Doctors testified that the pain associated with Ferguson's injuries would have been unimaginable.
 
 ¶9 The State presented evidence that the relationship between Appellant and Ferguson was tumultuous, that Appellant had made a number of menacing and threatening statements to and about Ferguson, and that Ferguson had sought a protective order against Appellant. A few weeks before the fire, Ferguson moved out of Appellant's home to live with a friend, Jenny Turner. Turner testified that Appellant threatened to kill Ferguson several times, saying things like, "I will kill you before I see you happy in Talihina." On one occasion, Appellant drove by Turner's home, waved a handgun and said, "I wanted y'all to see my new friend." Turner also recalled that a week before the fire, Appellant tried to run over Ferguson in his car.
 
 ¶10 The defense presented testimony from several of Appellant's family, who described the relationship between Appellant and Ferguson and their observations during the fire. None of them had personal knowledge about how the fire started.
 
 ¶11 In the first stage of the trial, the jury found Appellant guilty of First Degree Felony Murder in the Commission of First Degree Arson, rejecting the lesser alternative crimes of Second Degree Murder (Depraved Mind), First Degree Manslaughter (Heat of Passion), and Second Degree Manslaughter (Culpable Negligence). The jury's guilty verdict on a capital offense led to a second, capital sentencing phase of the trial. The State adopted the first-stage evidence to support its two aggravating circumstances. It presented victim impact testimony from Ferguson's father, mother, stepmother, and sister. It also presented brief expert testimony about the pain Ferguson likely suffered as a direct result of her burns. The defense presented many friends and family who testified to Appellant's upbringing, work habits, religious conviction, and general character as a good person whose life should be spared. The defense also presented a psychologist who examined Appellant and a mitigation specialist who provided a summary of Appellant's life story. After being instructed on how to consider the evidence relevant to sentencing, the jury recommended punishment of death.
 
 ANALYSIS
 
 ¶12 In Proposition I, Appellant claims his inability to review certain materials has denied him his right to a meaningful appeal. Both trial counsel and appellate counsel designated, for the record on appeal, a "complete transcript" of each proceeding, and all exhibits "offered by any party, whether admitted or not." During the pendency of the appeal, appellate counsel filed several objections claiming the appeal record was not complete. Several times, we remanded the case to the district court to determine whether items were in fact missing, and if so, whether they could be recovered.[3] The materials at issue here fall into two groups: (1) omissions from the transcript of proceedings below, and (2) physical evidence presumably lost or destroyed before the appeal was perfected.
 
 ¶13 Appellant complains that no record exists of a motion hearing held December 4, 2013, a few days before trial began. The fact that a hearing was held on that date is not in dispute; in fact, counsel for both parties were in substantial agreement about much of what was discussed, including Appellant's complaints about his attorneys' communication with him. Importantly, both counsel also recalled stipulating that the State would substitute photographs and laboratory reports for much of its physical evidence. However, the district court concluded that no transcript or reporter's notes from the hearing could be found. Over Appellant's objection, we accepted the trial court's findings and conclusions, and deemed the appeal record complete.
 
 ¶14 Appellant has also catalogued several points in the trial proceedings where a participant's response is not recorded. These complaints fall into two categories: (1) where prospective jurors were asked to raise their hands in response to certain questions, but no record is made of how each individual panelist responded; and (2) where the response of a prospective juror or witness is described as "inaudible" by the court reporter. Finally, during the preparation of the appeal, appellate defense counsel attempted to locate physical evidence collected at the scene of the fire. This Court remanded the case to the district court to determine if this evidence still existed, but apparently it does not. Again, we note that the parties agreed to introduce photographs in lieu of most of the physical evidence related to this case.
 
 ¶15 As to the transcript of proceedings, Appellant acknowledges that it is his burden to show prejudice from any perceived omissions. Parker v. State, 1994 OK CR 56, ¶¶ 25-27, 887 P.2d 290, 294-95. Failure to provide a complete record of every word spoken, or every action taken, in the proceedings below is not per se reversible error. Harris v. State, 2007 OK CR 28, ¶ 7, 164 P.3d 1103, 1108-09. If the record is so incomplete that this Court cannot conduct a meaningful review, then relief may be warranted, particularly in capital cases where we are statutorily obligated to review the appropriateness of the death sentence. See Black v. State, 2001 OK CR 5, ¶¶ 83-88, 21 P.3d 1047, 1075-76.[4] Yet Appellant makes no attempt to show prejudice in this proposition. Instead, he claims prejudice will be shown as the omissions relate to other propositions of error, specifically Propositions III, VIII, XV, and XVII.[5] We will revisit the purportedly missing evidence and testimony as necessary in those claims. Proposition I is denied.
 
 ¶16 Propositions II, III, and IV share some factual background. The State's primary evidence against Appellant in the guilt phase consisted of Ferguson's statements immediately after the fire, Appellant's own incriminating statements and conduct after the fire, and his inconsistent and sometimes fanciful explanations in interviews with authorities. Appellant's defense team retained the services of an expert to assist in reviewing the State's handling of the investigation. In Proposition II, Appellant claims he was denied a fair trial because he was unable to present expert testimony to the jury. In Proposition III, he claims he was denied a fair trial because the State failed to preserve physical evidence from the fire scene. In Proposition IV, he accuses the State of failing to disclose evidence affecting the credibility of the investigator who collected evidence from the scene.
 
 ¶17 The fire occurred on the evening of February 18, 2012. The State Fire Marshal's Investigator, Tony Rust, spoke with Appellant and collected his clothing shortly after Appellant was taken into custody in the early morning hours of February 19, but Rust was unable to safely inspect the scene of the fire or collect evidence from it until a few days later. Rust submitted the physical evidence he collected to the OSBI in late February 2012. It was examined and analyzed in May 2012. Appellant's defense team hired its expert, David Smith, in late October 2012. Almost a year later, in September 2013, Smith submitted a brief report outlining his own conclusions about Agent Rust's investigation. Smith lives in Arizona. His report was based on documents, photos, and other material provided by defense counsel. There is no indication that Smith visited the scene of the fire; he did not personally inspect or test any physical evidence, and never asked to do so. A copy of Smith's report is included in the trial record as Court's Exhibit 2.
 
 ¶18 Smith was listed as a potential witness for the defense. Sometime during the first day of jury selection (December 9, 2013), defense counsel received word that Smith had suddenly developed a serious medical condition which prevented him from traveling. Counsel notified the trial court of the situation on the second day of jury selection (December 10), and provided an update after the third and final day of jury selection (December 11), telling the court that Smith would be sending paperwork about his condition. The State began presenting its evidence on the morning of December 12. That same day, defense counsel filed a verified motion for mistrial based on Smith's unavailability. The court heard argument on the motion on December 13. The State rested its guilt-stage case on the morning of December 14. Although defense counsel renewed his request for mistrial several times during the trial, documents substantiating Smith's condition were not received by the court until after the State had rested.
 
 ¶19 In Proposition II, Appellant claims the trial court's refusal to grant a mistrial, or at least a continuance, until Smith (or a replacement) could be brought in, infringed on his Sixth Amendment right to compulsory process, and ultimately violated his Fifth Amendment right to present a complete defense. We review a trial court's refusal to grant a mistrial or a continuance for an abuse of discretion. Jackson v. State, 2006 OK CR 45, ¶ 11, 146 P.3d 1149, 1156 (mistrial); Marshall v. State, 2010 OK CR 8, ¶ 44, 232 P.3d 467, 478 (continuance).
 
 ¶20 As noted, after jury selection had begun, the defense team learned that Smith, its fire expert, had developed a serious medical condition, and had been advised by his physician not to travel. Counsel appears to have communicated this development promptly to the prosecutor and the court. At the end of December 10, the second day of jury selection, lead defense counsel made reference to prior off-the-record discussions about how to proceed, mentioned a "potential, maybe, solution" that the prosecutor had suggested, and said he would probably be filing a motion for mistrial if Smith was indeed unable to travel. On December 11, the final day of jury selection, defense counsel told the court that Smith was sending paperwork about his condition. The State began presenting its evidence on the morning of December 12. That same day, defense counsel filed a verified motion for mistrial based on Smith's unavailability, with a brief "no travel" directive, presumably from Smith's physician and scribbled on a prescription pad, attached to the motion. The court heard argument on the motion on December 13, but declined to take any action without additional information. The State rested its guilt-stage case on the morning of December 14. Although defense counsel renewed his request for mistrial several times during the trial, documents substantiating Smith's condition were not received by the court until after the State had rested on December 14. The court commented that a brief continuance might have been possible, but defense counsel could never say how much additional time was needed before Smith could appear or a replacement expert could be obtained.
 
 ¶21 From this record we conclude the following: (1) a continuance was at least considered, initially, as a possible remedy to the situation, and the prosecutor suggested some other alternative, possibly testifying by video; (2) defense counsel never formally requested a continuance; and (3) instead of formally requesting a continuance, or seeking alternative means of securing Smith's testimony without interrupting or delaying the trial, defense counsel took a different tack and moved for a mistrial, on the theory that Appellant had a constitutional right to demand the physical presence of his witnesses.
 
 ¶22 The Compulsory Process Clause of the Sixth Amendment, in conjunction with the Due Process Clause of the Fifth Amendment, have been interpreted to guarantee the accused a fair opportunity to secure and present relevant evidence. States may not enact laws or enforce rules that arbitrarily and unfairly prevent the accused from presenting relevant evidence. See generally Washington v. Texas, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967) (invalidating state evidence rule declaring accomplices to be "incompetent" as witnesses unless they were testifying for the prosecution or had been acquitted); Crane v. Kentucky, 476 U.S. 683, 690, 106 S.Ct. 2142, 2146, 90 L.Ed.2d 636 (1986) (invalidating state rule barring defendant from presenting evidence to jury relevant to the voluntariness of his confession).
 
 ¶23 States may, however, enforce reasonable rules of procedure that apply to both parties. For example, in Taylor v. Illinois, 484 U.S. 400, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988), the trial court barred the defendant from presenting a material witness as a sanction for failing to disclose that witness to the prosecution during pretrial discovery. The Court began by noting that, unlike other Sixth Amendment rights (such as the right to confront one's accusers), the Compulsory Process Clause "is dependent entirely upon the defendant's initiative"; the decision whether to invoke that right "rests solely with the defendant." 484 U.S. at 410, 108 S.Ct. at 653. The Court then observed that our adversary system could not function without rules of procedure that "govern the orderly presentation of facts and arguments to provide each party with a fair opportunity to assemble and submit evidence to contradict or explain the opponent's case." Id. at 411, 108 S.Ct. at 654. Ultimately, the Court concluded that barring Taylor's defense witness was an acceptable sanction under the circumstances, because the Sixth Amendment "does not confer the right to present testimony free from the legitimate demands of the adversarial system." Id. at 412-13, 108 S.Ct. at 655 (quoting United States v. Nobles, 422 U.S. 225, 241, 95 S.Ct. 2160, 2171, 45 L.Ed.2d 141 (1975)).
 
 ¶24 As Appellant claims the trial court's refusal to accommodate his situation to his satisfaction was tantamount to denying him the right to present a defense, he must show (1) that the court prevented him from obtaining or presenting evidence; (2) that the court's action was arbitrary or disproportionate to any legitimate evidentiary or procedural purpose; and (3) that the excluded evidence "would have been relevant and material, and ... vital to the defense." Washington, 388 U.S. at 16, 87 S.Ct. at 1922. The requirement of materiality is in keeping with other situations where a defendant has been denied access to evidence, whether by loss, destruction, or concealment by the prosecution. See United States v. Valenzuela-Bernal, 458 U.S. 858, 867-69, 102 S.Ct. 3440, 3446-47, 73 L.Ed.2d 1193 (1982).
 
 ¶25 As to the first two Washington criteria, Appellant was not barred from presenting Smith's testimony as punishment for failing to follow procedure, or as a result of some arbitrary rule. A defendant's right to present a defense is not unlimited; it is subject to reasonable restrictions. United States v. Scheffer, 523 U.S. 303, 308, 118 S.Ct. 1261, 1264, 140 L.Ed.2d 413 (1998). Defense counsel did not formally request a continuance, but if he had, it would properly have been denied on the information provided to the court at the time. If a continuance is requested due to an absent witness, the proponent must inform the court of "the probability of procuring [the absent witness's] testimony within a reasonable time, and what facts [counsel] believes the witness will prove, and that he believes them to be true." 12 O.S.2011, § 668. Defense counsel did none of these things.
 
 ¶26 Nor did defense counsel make a record of any alternative remedies that were considered, such as having Smith testify remotely, and why no alternative to Smith's physical presence was feasible. See e.g. Harris v. State, 2004 OK CR 1, ¶ 10 n.3, 84 P.3d 731, 740 n.3 (live video testimony employed in capital murder trial where, ten days into the trial, terrorist attacks shut down air travel nationwide). The record shows that defense counsel had considered the possibility of having Smith testify by video, but instead took the position that the right to compulsory process included the absolute right to insist upon in-person testimony from any witness considered important to the defense. There simply is no authority for such a position.[6]
 
  
 
 ¶27 In our view, this is a case of unfortunate timing, with defense counsel ultimately unwilling to try to mitigate his predicament. By the time the trial court received the barest details of Smith's situation, the State's case-in-chief was well under way. Defense counsel could not offer even a ball-park estimate of when the defense could be ready. In its extended colloquy with defense counsel on December 13, the trial court discussed relevant case law, and expressed considerable understanding of the medical condition that Smith had apparently experienced. As for Smith's situation, all the court had before it was a doctor's note, scribbled on a prescription pad, advising Smith not to travel. The court took no action at that time, but invited counsel to bring more information as he received it. By the end of that same day, the State's guilt-stage case was almost complete. By the time the court received detailed information about Smith's status on December 14, the State had already rested its case.
 
  
 
 ¶28 Even if Appellant could show that the trial court's refusal to abort or pause the trial was unreasonable and disproportionate, he must still show that he was denied the right to present information material to his defense, and a reasonable likelihood that such information, if presented, would have affected the jury's verdict. Washington, 388 U.S. at 16, 87 S.Ct. at 1922; Valenzuela-Bernal, 458 U.S. at 873-74, 102 S.Ct. at 3450. Appellant was not denied a fair opportunity to use Smith's contribution to this case. Smith's written report summarizes the work he had done and the conclusions he had drawn. As we have noted, Smith never visited the scene or sought to inspect any physical evidence. He had no palpable alternative explanation for how the fire started. His only task was to critique the methods used and opinions reached by the State's investigator, Agent Rust. After reviewing the materials provided to him, Smith's conclusions were that Rust (1) failed to follow "recognized practices and methodologies," resulting in opinions that were "scientifically flawed"; (2) failed to establish a "competent ignition source" or "ignition scenario"; and (3) failed to formulate or test alternative hypotheses for how the fire started.
 
 ¶29 The gist of Smith's two-page report is that Rust was unable to independently establish, through physical evidence (i.e., ignoring what eyewitnesses told him), a probable scenario for how and where the fire began. Where the fire began was never in dispute; according to Appellant and others in the house at the time, it began in his bedroom. How the fire began -- and more precisely, how Ferguson came to be covered in gasoline -- was disputed, but the various possibilities Appellant suggested to police were just that: possibilities. They were inconsistent with what Ferguson said, they were inconsistent with what Appellant had told Melvin Bannister, and they were inconsistent with one another. Appellant finally told Detective Saulsberry he had "no idea" how the fire started. As for the gasoline, Appellant initially told Saulsberry that Ferguson must have accidentally knocked the bottle off the table; later, he claimed that Ferguson (inexplicably) smashed the bottle into the flames on purpose.
 
 ¶30 While it may generally be the task of the Fire Marshal to investigate the cause of a fire with unknown or suspicious origin, Smith's expert opinion seems to fault Rust for paying attention to important primary evidence: the statements of Appellant and Ferguson, the only eyewitnesses to the fire's beginnings. Agent Rust focused on collecting the remains of the Crown Royal bottle because Appellant told Rust (and others) that he kept that bottle, full of gasoline, in his room, and because Appellant himself said the gasoline played a part in the fire. Appellant's strategy was to claim that the fire might have been an accident -- that it might have been caused by, say, a spark from an overloaded electrical outlet -- and that Agent Rust failed to eliminate those kinds of possibilities. Defense counsel took Rust to task for his methods and opinions. Appellant himself notes that trial counsel's cross-examination of Rust was "extensive." Counsel flatly told Rust, "I'm trying to show this jury that you did a poor investigation."
 
 ¶31 Appellant has not shown this Court that Smith himself could have been any more effective in disputing Rust's theory. Rust never denied that an electrical spark can cause a fire; he simply had no evidence on which to rest such a theory in this case. If Smith had attended the trial, defense counsel still would have cross-examined Rust, in presumably the same manner, in the State's case-in-chief. Smith's testimony would have been somewhat cumulative, since he had conducted no tests or examinations, and had no specific, evidence-based alternative theories of his own. The State obligated itself to proving that Appellant intentionally set fire to Ferguson. The foundation of its theory consisted of the things Appellant and Ferguson said immediately after the fire. The State was only required to dispel any reasonable doubt about its theory; it was not required to disprove all other conceivable ones.[7]
 
  
 
 ¶32 Appellant claims the record is "replete" with instances where Smith's expert testimony would have been material and favorable, but he does not give any examples. We find Smith's role to be somewhat attenuated. He was not an eyewitness to the events giving rise to the charge, nor was he offered as a crucial witness in mitigation of sentence. He could not provide expert guidance as to Appellant's capacity to understand the nature and consequences of his acts. Cf. Frederick v. State, 1995 OK CR 44, ¶¶ 16, 25-26, 902 P.2d 1092, 1095-96, 1098 (capital defendant, whose sanity was in question, was denied a fair trial when court refused to grant a continuance to allow a psychiatrist to examine him); Coddington v. State, 2006 OK CR 34, ¶¶ 81-82, 90, 142 P.3d 437, 458, 460 (capital defendant was denied a fair trial by exclusion of his mother's video-taped testimony from the sentencing phase of trial).[8] Rather, Smith's opinions only tangentially relate to Appellant's guilt or innocence, because they merely call into question the thoroughness of investigator Rust whose greatest error was failing to look through the charred remains of the fire scene for ways to bolster theories that not even Appellant could credibly offer. We conclude that the material aspects of Smith's proffered expert opinion were sufficiently presented through the cross-examination of Agent Rust.
 
  
 
 ¶33 An abuse of discretion is an unreasonable, unconscionable and arbitrary action taken without proper consideration of the facts and law pertaining to the matter submitted. Cuesta-Rodriguez v. State, 2010 OK CR 23, ¶ 19, 241 P.3d 214, 225. A defendant's right to present evidence is one of the core guarantees of due process. But given Appellant's apparent refusal to seriously consider viable alternatives (such as remote testimony), and his inability to estimate how much additional time was needed, we cannot say the trial court abused its discretion in refusing to abort or indefinitely pause a trial that was already well under way.[9] The record shows the trial court fairly and thoughtfully considered the situation as it developed. Furthermore, we do not believe Smith's absence prevented defense counsel from using his report to its fullest practical value. Appellant was not denied the right to present a defense to the crime; rather, through unfortunate circumstances and his own tactical decisions, he was unable to use impeachment evidence in a way that he now considers optimal. Considering the limited utility of Smith's critique, and the strong evidence of Appellant's guilt, we find no reasonable probability that Smith's presence would have affected the outcome of the trial. Valenzuela-Bernal, 458 U.S. at 873-74, 102 S.Ct. at 3450. Proposition II is denied.
 
 ¶34 In Proposition III, Appellant claims he was denied due process because the State failed to preserve certain physical evidence. The Due Process Clause of the Fourteenth Amendment obligates the State to preserve evidence that might be expected to play a significant role in a suspect's defense. California v. Trombetta, 467 U.S. 479, 488-89, 104 S.Ct. 2528, 2534, 81 L.Ed.2d 413 (1984). This obligation is not triggered unless the exculpatory value of the evidence is apparent before its destruction, and the evidence is such that the defendant would be unable to obtain comparable evidence by other reasonably available means. Id. When the exculpatory value of the evidence is not apparent, a less stringent test applies. If the State failed to preserve evidence that can only be called potentially useful to the defense, then no relief is warranted unless the defendant can show bad faith on the State's part. Arizona v. Youngblood, 488 U.S. 51, 58, 109 S.Ct. 333, 337, 102 L.Ed.2d 281 (1988); Cuesta-Rodriguez, 2010 OK CR 23, ¶ 20, 241 P.3d at 225.
 
 ¶35 As noted, Agent Rust collected physical evidence from the scene, as well as the clothing Appellant was wearing and the lighter he was carrying when he was arrested. Rust sent those items (except the lighter) to the Oklahoma State Bureau of Investigation for examination, which found traces of gasoline, or components of gasoline, on them. The OSBI analysis took place in May 2012. The evidence was then returned to LeFlore County authorities. However, at some point after testing, the evidence was lost.[10]
 
  
 
 ¶36 We first consider whether this evidence had any apparent exculpatory value. The simple answer is that, if the evidence had had any tendency to substantiate any part of the defense theory, or contradict the State's theory, then defense counsel would have at least asked to inspect it. Instead, counsel stipulated that photographs of the evidence were sufficient for the jury's purpose. Similarly, if the prosecutor had felt this evidence materially advanced the State's theory, she presumably would have introduced it. In reality, there was nothing particularly probative about the physical evidence for either party, as it only tended to corroborate what was never in dispute: that Appellant owned a cigarette lighter, that he had a Crown Royal bottle full of gasoline in his bedroom, and that the gasoline played some part in the fire that killed Ferguson. The OSBI's findings were entirely consistent with these facts and, in the end, no surprise to anyone. Indeed, Appellant does not take issue with those findings. We fail to see any exculpatory value in this evidence which would have been readily apparent before it went missing. Appellant offers no theory of how any of this evidence might have been parlayed to his advantage with additional examination or testing. Nor does he allege any bad faith on the part of the State in allowing this evidence to be lost or destroyed, which is fatal to any claim that the evidence was at least potentially useful to the defense.[11]
 
  
 
 ¶37 Once again, we stress that neither Appellant's defense lawyers nor his expert ever asked to inspect any of this evidence before trial.[12] Given the totality of the evidence presented, we can understand why: there was nothing to be gained from it. Due process does not impose "an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." Youngblood, 488 U.S. at 58, 109 S.Ct. at 337. Appellant has failed to show either (1) that the State permitted the loss or destruction of physical evidence whose exculpatory value was apparent at the time, or (2) that the State acted in bad faith in permitting the loss or destruction of physical evidence with even potential value to the defense. Proposition III is denied.
 
  
 
 ¶38 In Proposition IV, Appellant claims he was denied a fair trial by the State's failure to disclose evidence which could have impeached the credibility of Agent Rust, the State fire investigator who collected evidence and transmitted it to the OSBI. Due process requires the State to disclose evidence favorable to an accused, including evidence that would impeach the credibility of the State's witnesses or the probative force of its physical evidence. Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963); United States v. Bagley, 473 U.S. 667, 677, 105 S.Ct. 3375, 3381, 87 L.Ed.2d 481 (1985); Bramlett v. State, 2018 OK CR 19, ¶ 28, 422 P.3d 788, 797. To establish a Brady violation, a defendant need not show that the State intentionally withheld such information. He must, however, show that the evidence had exculpatory or impeachment value, and that it was material, such that there is a reasonable probability that its omission affected the outcome of the proceeding. Id. The question is whether, absent the non-disclosed information, the defendant received a fair trial resulting in a verdict worthy of confidence. Id.
 
 ¶39 Because Brady claims, by definition, involve information that was not timely disclosed to the defense, they typically do not arise until sometime after trial. We remanded this case during the pendency of the appeal to resolve issues concerning the completeness of the record and the availability of physical evidence (see Proposition III). Information related to the present claim was presented at some of those hearings. Thus, the record before us already contains some of the factual basis for Appellant's Brady claim. Additional affidavits are included in a supplementary filing pursuant to Rule 3.11(A), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch.18, App. (2019), which provides:
 
 After the Petition in Error has been timely filed in this Court, and upon notice from either party or upon this Court's own motion, the majority of the Court may, within its discretion, direct a supplementation of the record, when necessary, for a determination of any issue; or, when necessary, may direct the trial court to conduct an evidentiary hearing on the issue.
 
 ¶40 While seldom used, this provision seems well-tailored to the situation before us, where the supplementary materials inform and offer a more complete understanding of matters that were developed during the pendency of the appeal, and which themselves are part of the appeal record. Pursuant to Rule 3.11(A), we GRANT Appellant's request to consider investigators' affidavits and materials attached to them in conjunction with the Brady claim that arose during the post-trial remand hearings. Coddington v. State, 2011 OK CR 17, ¶ 21, 254 P.3d 684, 698.
 
 ¶41 The information at issue here falls into three categories: (1) an investigation into Rust's job performance, conducted by the Oklahoma State Fire Marshal's Office, several years before this case and unrelated to it; (2) the prosecutor's own interactions with Rust in the past; and (3) other allegations of job-related misconduct which did not come to light until after the trial.
 
 ¶42 We may easily dispense with the last allegation, because its factual basis simply did not exist at the time of trial. Appellant could not have impeached Rust's credibility with events that had not yet happened. Appellant concedes that the "bulk" of his concerns with Agent Rust's credibility relate to his investigation of this case, and he does not claim that the prosecutor has withheld any information on that subject. Since those allegations arose, the prosecutor has been completely cooperative and forthcoming in transmitting information to Appellant's defense team.[13]
 
  
 
 ¶43 As for the remaining matters, we question whether Brady extends to a prosecutor's personal opinion about a particular officer's work habits, punctuality, or similar issues. We also question whether Brady requires prosecutors to trawl for impeachment ammunition (including confidential personnel information) about every agent, from any arm of law enforcement, who had any involvement in a particular investigation. Given the posture of the case, we need not explore those questions here. The scope of the prosecutor's obligations are moot, because Appellant is not seeking potential Brady material; he already has the material. Regardless of the prosecutor's obligations or good faith, no Brady claim can succeed unless there is a reasonable probability that the evidence in question would have affected the outcome of the proceeding.
 
  
 
 ¶44 The remaining allegations concern Rust's training and other alleged personnel issues which occurred before this prosecution. We stress that these allegations do not involve claims that Rust ever destroyed, hid, or tampered with any evidence, in this investigation or in any other. In essence, the evidence that developed after trial suggested that Rust had not always followed office policy in his investigations, and that the prosecutor herself had unspecified "issues" with Rust while she briefly supervised him years before.[14] We believe any impeachment value in Agent Rust's general work habits bears little relevance to this case. Appellant claims Rust's credibility was essential -- that the State could not have made its case without him. We disagree. The State's case was built upon the statements of the victim immediately after the fire, and Appellant's own suspicious conduct and statements. Rust's credibility per se was not central to the State's case, because Rust's participation was limited to collecting evidence from Appellant and the fire scene, and -- as we observed in Proposition III -- the probative value of that evidence was marginal as well. Furthermore, Rust's perceived lapses in this case were made apparent to the jury. Defense counsel chastised Rust on cross-examination for not considering alternative theories of how the fire started. The OSBI criminalist who tested the materials Rust submitted to him testified that Rust's preservation of Appellant's clothing was "probably one of the worst" evidence-collection jobs he had seen.[15]
 
  
 
 ¶45 Appellant does not claim any of the evidence Rust collected was tampered with or planted. He does not claim that his statements to Rust were coerced or fabricated. As we have noted, the fact that Appellant kept a liquor bottle full of gasoline in his bedroom, and that gasoline played a part in the fire that killed Ferguson, was never in dispute. Contrary to Appellant's claim, Rust did not "rush to judgment" by focusing on and retrieving pieces of the liquor bottle from the scene; his focus was guided by Appellant's own account of what happened. The only question at trial was whether Appellant intentionally set Ferguson ablaze. Rust never claimed any ability to "prove" that contention.
 
  
 
 ¶46 In a Brady analysis, evidence is material only if there is a reasonable probability that, had the evidence been timely disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is one "sufficient to undermine confidence in the outcome." Bagley, 473 U.S. at 682, 105 S.Ct. at 3383. Put another way, evidence is material only if it could "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Cone v. Bell, 556 U.S. 449, 470, 129 S.Ct. 1769, 1783, 173 L.Ed.2d 701 (2009) (quoting Kyles v. Whitley, 514 U.S. 419, 435, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995). Evidence with only marginal, incremental, or cumulative impeachment value will rarely meet this standard. Douglas v. Workman, 560 F.3d 1156, 1173 (10th Cir. 2009); United States v. Derr, 990 F.2d 1330, 1336 (D.C.Cir. 1993). The State's case did not rest on Agent Rust's credibility. It did not even rest, to any material degree, on the evidence he collected. Appellant has not demonstrated a reasonable probability that any of the proffered information concerning Agent Rust would have affected the outcome of the trial. Proposition IV is denied.
 
 CLAIMS OF TRIAL ERROR
 
 A. Other crimes evidence
 
 ¶47 In Proposition V, Appellant complains that three witnesses were allowed to relate evidence of other threats and intimidating acts he committed against Ferguson preceding her death. The evidence at issue consisted of the following: (1) testimony that Ferguson once sought a protective order to keep Appellant away from her; (2) testimony that shortly before the homicide, Appellant told a neighbor to "stop helping" Ferguson; and (3) testimony from Ferguson's friend, Jenny Turner, that when Ferguson lived with her in early 2012, Appellant drove by their home, waved a gun out of the car window and said, "I wanted ya'll to see my new friend." According to Turner, Appellant also tried to run over Ferguson and once warned her, "I will kill you before I see you happy in Talihina." Turner said that Ferguson was so afraid of Appellant that she would sleep with a knife under her pillow. The trial court held a hearing on the admission of this evidence, and we review its ruling for an abuse of discretion. Cuesta-Rodriguez, 2010 OK CR 23, ¶ 25, 241 P.3d at 226.
 
 ¶48 Oklahoma's Evidence Code bars evidence of "other crimes, wrongs, or acts" offered only to show the defendant acted in conformity therewith. 12 O.S.2011, § 2404(B). Appellant points out that applying for a protective order is not, itself, evidence of any crime that might have been committed by the target of the order, and that asking his neighbor to "stop helping" Ferguson does not amount to a crime or bad act as contemplated by § 2404(B).[16] We agree, but those arguments only undermine his claim that this evidence falls under § 2404(B). We take his complaints to be, in reality, about relevance, and we find this evidence was relevant to show the nature of relationship between the parties.
 
 ¶49 Where a defendant's domestic partner is the victim (or intended victim) of the charged crime, evidence of prior difficulties between the two can be relevant to show motive, intent, and the absence of mistake or accident. Cuesta-Rodriguez, 2010 OK CR 23, ¶¶ 26-27, 241 P.3d at 226 (spouse); Short v. State, 1999 OK CR 15, ¶ 40, 980 P.2d 1081, 1097 (girlfriend). The State believed Appellant's controlling personality (demonstrated by his words and deeds, and their effect, as shown by Ferguson's fear of him) made it more likely that setting her on fire was no accident. Appellant freely admitted to police that his relationship with Ferguson was a tumultuous one. Appellant's gun-waving and intimidating comments, related by Ms. Turner, were relevant for the same reasons. The trial court gave a cautionary instruction on the limited use of bad-acts evidence, not only in the final first-stage instructions, but each time such evidence was presented. The trial court did not abuse its discretion in admitting this evidence.
 
 B. Hearsay
 
 ¶50 In Proposition VI, Appellant complains that some of the statements relating to his alleged prior threats toward Ferguson were inadmissible hearsay. Appellant did not object to the statements on hearsay grounds at the time, so our review is only for plain error. Appellant must show that a plain or obvious error affected the outcome of the proceeding. Hogan v. State, 2006 OK CR 19, ¶ 38, 139 P.3d 907, 923. This Court will correct plain error only where it seriously affects the fairness, integrity, or public reputation of the proceedings. Id.
 
 ¶51 "Hearsay" is a statement, other than one made by a person testifying, offered to prove the truth of the matter asserted. 12 O.S.2011, § 2801(A)(3). As noted, Ferguson moved out of Appellant's home at one point and lived with her friend, Jenny Turner. Turner testified that when Ferguson told Appellant to stop coming around, he became angry and threatened to kill her. The "truth" of Ferguson's request, such as it can be discerned (presumably, whether she truly wanted Appellant to stop visiting), is not material. Turner was asked to relate the exchange between Ferguson and Appellant that she witnessed. As with the gun-waving incident discussed in Proposition V, the purpose of eliciting this event was to show Appellant's statements, not the truth or falsity of anything Ferguson said. Appellant's own extrajudicial statements, offered against him, are not hearsay. 12 O.S.2011, § 2801 (B)(2)(a). The statements at issue here were not inadmissible hearsay.[17] Proposition VI is denied.
 
 C. Prosecutor misconduct
 
 ¶52 In Proposition VII, Appellant identifies several statements made by the prosecutor during the trial that he believes were unfairly prejudicial to him. We generally review claims of prosecutor misconduct cumulatively, to determine if the combined effect denied the defendant a fair trial. Warner v. State, 2006 OK CR 40, ¶ 197, 144 P.3d 838, 891.
 
 1. Misstatement of fact in closing argument
 
 ¶53 In guilt-stage closing argument, the prosecutor told the jury that according to two physician witnesses, the burn patterns on Ferguson's body were consistent with having been doused with a flammable liquid and set on fire, when only one of those experts, Dr. Pfeifer (the Medical Examiner who conducted the autopsy), actually rendered that opinion. Both parties have the right to discuss the evidence from their respective standpoints. Bland v. State, 2000 OK CR 11, ¶ 97, 4 P.3d 702, 728. Appellant implies that the prosecutor was obligated to, in essence, argue against her own case. The issue in dispute here was a very narrow one. It was not whether Ferguson's burns were the product of a liquid accelerant, such as gasoline; even defense counsel did not dispute that conclusion. It was whether -- as defense counsel put it to Dr. Pfeifer -- there are "lots of other circumstances that a person could find themselves with accelerant on them" besides being intentionally doused by another person. (Dr. Pfeifer agreed that there were.) The prosecutor did misstate the number of witnesses who gave a certain opinion, but this minor error did not contribute to the verdict. Id., 2000 OK CR 11, ¶ 102, 4 P.3d at 728.
 
 2. Alleged attack on defense counsel
 
 ¶54 Appellant claims the prosecutor impugned defense counsel's integrity. In the punishment stage, the defense presented Krystal Green, the mother of Appellant's eight-year-old child, to testify in mitigation of sentence. Green testified about taking the child to see Appellant in jail. The prosecutor objected, complaining that "subjecting this child to what we're fixing to talk about [is] borderline abuse." Defense counsel took umbrage at this characterization and asked for a mistrial. The trial court rejected both parties' complaints, and the questions resumed. Appellant reads this as a direct attack on defense counsel, but we do not. The prosecutor was not complaining about the questions being put to the witness, but the fact that the eight-year-old subject of the questioning remained in the courtroom. The prosecutor was rightfully concerned about emotional outbursts in front of the jury -- the same kinds of outbursts that Appellant himself complains about in Proposition IX. Trials can be emotional events, and a capital sentencing proceeding is hardly an exception. Sometimes, in the heat of argument, counsel may use hyperbole or otherwise say things that are not entirely justified. See Dodd v. State, 2004 OK CR 31, ¶ 78, 100 P.3d 1017, 1041; Gilbert v. State, 1997 OK CR 71, ¶ 97, 951 P.2d 98, 121. But we find no outcome-influencing error here.
 
 3. Comments on the possibility of parole
 
 ¶55 A defendant convicted of specified crimes, including First Degree Murder, may not be considered for parole until he has served at least 85% of the original sentence. 21 O.S.2011, § 13.1. Appellant's jury was correctly instructed that "If a person is sentenced to life imprisonment, the calculation of eligibility for parole is based upon a term of forty-five (45) years... ." OUJI-CR 10-13B (emphasis added). The prosecutor referred to this instruction in both stages of trial.[18] Appellant did not object to either comment, so we review only for plain error. Barnes v. State, 2017 OK CR 26, ¶ 6, 408 P.3d 209, 213. Appellant claims the prosecutor erroneously suggested that he was guaranteed to be released after 45 years, if not earlier. We disagree. Each time, the prosecutor was specifically talking about application of the 85% Rule to a life sentence -- not about the "meaning" of a life sentence in general. No defendant is entitled to parole, even under the 85% Rule, and the prosecutor never made such an insinuation.[19] Nor has Appellant demonstrated a reasonable probability of prejudice. Any concerns about the first comment are mooted by the fact that it was made in reference to the lesser-related offense options, which the jury rejected. If, in the capital-sentencing stage, the jury had any confusion or misgivings about the possibility of Appellant's future release if given a straight life sentence, but did not believe a sentence of death was appropriate, it could have settled on a sentence of life without parole. But it did not. Proposition VII is denied.
 
 D. Chain of custody regarding Appellant's cigarette lighter
 
 ¶56 In Proposition VIII, Appellant claims the trial court erred in admitting State's Exhibit 9, a cigarette lighter he had with him when he was arrested, because the State failed to establish a sufficient "chain of custody." Because defense counsel objected to the chain of custody at the time, we review the trial court's ruling for an abuse of discretion. Jones v. State, 1995 OK CR 34, ¶ 79, 899 P.2d 635, 653. Identification and authentication of physical evidence can generally be satisfied by testimony that the evidence is what a proponent claims. 12 O.S.2011, § 2901(B)(1). The "chain of custody" concept guards against substitution of, or tampering with, physical evidence between the time it is found and the time it is analyzed. Mitchell v. State, 2010 OK CR 14, ¶ 74, 235 P.3d 640, 657. It is not necessary that all possibility of tampering be negated. Alverson v. State, 1999 OK CR 21, ¶ 22, 983 P.2d 498, 509. The lighter was never analyzed by either party. Appellant never denied possessing it, and the State never sought to prove any particular attributes of it. Thus, actual presentation of the lighter to the jury was superfluous. Appellant does not explain how the "integrity" of the lighter might have affected the State's case or his theory of defense. Three witnesses testified as to how the lighter was confiscated and secured as evidence, and that testimony was sufficient to admit the lighter. Proposition VIII is denied.
 
 E. Display of emotion during guilt stage
 
 ¶57 During the testimony of Martha Johnson, as she related things Ferguson said to her before being transported from the scene, defense counsel approached the bench and moved for a mistrial because members of Ferguson's family were "creating a disturbance." Alternatively, counsel asked the court to admonish the jurors to disregard the disturbance, but counsel then agreed with the court that an admonition might just bring more attention to the event. The trial court did not grant a mistrial, and in Proposition IX, Appellant assigns error to that ruling. We review the ruling for an abuse of discretion. Jackson v. State, 2006 OK CR 45, ¶ 11, 146 P.3d 1149, 1156. The court assured defense counsel that it would speak with the victim's family and remind them that emotional outbursts could not be tolerated. In fact, that remedy appears to have satisfied counsel's concerns.[20] The "disturbance" is not described in any detail in the record. It appears, however, to have been brief in duration; the victim's mother promptly left the courtroom to regain her composure. No other distracting displays of emotion are mentioned.[21] Under these circumstances, we believe the trial court took appropriate measures to prevent unfair prejudice to Appellant. Ellis v. State, 1992 OK CR 45, ¶ 13, 867 P.2d 1289, 1297. The trial court did not abuse its discretion in refusing to grant a mistrial, and Proposition IX is denied.
 
 PUNISHMENT STAGE ISSUES
 
 A. Sufficiency of instructions on mitigating evidence
 
 ¶58 In Proposition X, Appellant complains that the packet of instructions provided to the jurors in the sentencing phase, as reproduced in the appeal record, does not include OUJI-CR 4-78. This Uniform Jury Instruction informs the jurors that they need not be unanimous in their consideration of mitigating evidence, i.e. factors that might support a sentence other than death. The instructions included in the appeal record skip from Instruction No. 58 (OUJI-CR 4-77) to Instruction No. 60 (OUJI-CR 4-79). Appellant claims the omission of OUJI-CR 4-78 impaired the jury's proper consideration of an appropriate sentence. He assumes that because a written copy of the instruction is not included in the appeal record, it was not in the jury deliberation room, either. We simply have no information on this point. But even assuming that to be the case, we do not find grounds for relief.
 
 ¶59 A defendant cannot be eligible to receive the death penalty unless the jurors unanimously find the existence of at least one aggravating circumstance beyond a reasonable doubt. 21 O.S.2011, § 701.11; see Postelle v. State, 2011 OK CR 30, ¶ 60, 267 P.3d 114, 138. Appellant's jurors were properly instructed that they were "authorized to consider" a death sentence in that event. OUJI-CR 4-76. Even after finding an aggravating circumstance, jurors cannot impose a death sentence unless they unanimously conclude that the aggravating circumstances outweigh any evidence that mitigates the crime; jurors are in any event never required to impose a death sentence under any set of circumstances. Postelle, 2011 OK CR 30, ¶ 60, 267 P.3d at 138. Appellant's jurors were instructed on these points as well. OUJI-CR 4-80. The jurors were provided a list of mitigating circumstances advanced by the defense, but were also told they could consider any other factor they might find mitigating. OUJI-CR 4-79. The instruction omitted from the appeal record, OUJI-CR 4-78, elaborates on what "mitigating" means, reiterates that jurors need not be unanimous in deciding what factors they consider mitigating, and explains that mitigating circumstances need not be proven beyond a reasonable doubt.[22]
 
  
 
 ¶60 We addressed a similar situation in Cleary v. State, 1997 OK CR 35, 942 P.2d 736. In Cleary, Appellant claimed, and the State agreed, that one of the Uniform Jury Instructions was inadvertently omitted from the packet of written instructions given to the jury in the capital sentencing stage of the trial. The instruction at issue in Cleary told jurors they could not impose a death sentence unless they unanimously concluded that any aggravating circumstances outweighed any mitigating circumstances.[23] Id. at ¶¶ 57-58, 942 P.2d at 749. We noted at the outset:
 
  
 
 [T]he question is not whether the jury was instructed accurately and completely. It was. The only question before us is whether the omission of a written copy of the instruction is fatal to the second-stage proceeding.
 
 Id. at ¶ 59, 942 P.2d at 749 (emphasis in original).
 
 ¶61 While Oklahoma law may not unequivocally require jurors to have written copies of their instructions while deliberating,[24] we held in Cleary that, given the "severity and finality" of the death penalty, the omission of a written instruction from the packet given to Cleary's jury was error. Id. at ¶¶ 60-62, 942 P.2d at 749-750. Nevertheless, we found the error harmless beyond a reasonable doubt, because (1) the instruction was read to the jury, (2) it was neither complex nor confusing on its face, and (3) other written instructions adequately communicated these essential points: (1) that no death sentence could ever be imposed unless one or more aggravating circumstances was found, unanimously and beyond a reasonable doubt, and (2) the importance of considering mitigating circumstances in arriving at the ultimate sentence recommendation. Id. at ¶¶ 63-65, 942 P.2d at 750.
 
 ¶62 Appellant cites Cleary as factually analogous to his case, because it, too, deals with a capital-sentencing jury instruction omitted from the written record. He claims the omission of OUJI-CR 4-78 here is "plain error," and he contends the circumstances in this case prevent any conclusion that the error was harmless, as we found in Cleary. He ultimately claims the omission of the instruction denied him a constitutionally fair and reliable capital sentencing proceeding. We must therefore determine if there is a reasonable likelihood that Appellant's jury applied its instructions in a way that prevented its consideration of relevant mitigating evidence. Boyde v. California, 494 U.S. 370, 380, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316 (1990); Romano v. State, 1995 OK CR 74, ¶ 94, 909 P.2d 92, 123.
 
 ¶63 Whether there was an "error" at all here is uncertain. In Cleary, the State conceded that the omitted instruction did not go to the deliberation room. Cleary, 1997 OK CR 35, ¶ 57, 942 P.2d at 749. But here, we simply do not know if the instruction at issue was misplaced before or after deliberations. In any event, Cleary is instructive for a reason that Appellant does not mention. The "missing instruction" in Cleary addressed a different point of law than the one at issue here; but the trial court actually rejected Cleary's request for an instruction similar to the one Appellant complains about here. We found no error because we had held, many times before, that no such instruction was necessary. Id. at ¶ 49, 942 P.2d at 748; see also Pickens v. State, 1993 OK CR 15, ¶ 47, 850 P.2d 328, 339-340.
 
 ¶64 While the Eighth Amendment requires that capital sentencing jurors be allowed to consider all relevant mitigating evidence, it does not demand that States structure that consideration in any particular way. Kansas v. Carr, -- U.S. --, 136 S.Ct. 633, 642, 193 L.Ed.2d 535 (2016); Weeks v. Angelone, 528 U.S. 225, 233, 120 S.Ct. 727, 732, 145 L.Ed.2d 727 (2000); Buchanan v. Angelone, 522 U.S. 269, 276, 118 S.Ct. 757, 761, 139 L.Ed.2d 702 (1998); Warner v. State, 2006 OK CR 40, ¶ 140, 144 P.3d 838, 882, overruled on other grounds by Taylor v. State, 2018 OK CR 6, 419 P.3d 265. States need not expressly instruct capital juries on the concept of "non-unanimity" regarding mitigating evidence. Duvall v. Reynolds, 139 F.3d 768, 790-92 (10th Cir. 1998) (citing Buchanan). We thus find no constitutional significance to the "non-unanimity" language of OUJI-CR 4-78.[25]
 
  
 
 ¶65 Thus, even assuming Appellant's jury did not receive a written copy of OUJI-CR 4-78 (which, again, is not clear from the record), we find no reasonable probability that the jurors were prevented from fully considering mitigating evidence here. To this end, we may consider all of the instructions, oral and written, given to the jury, any relevant communications between judge and jury, as well as other statements by the court and arguments by counsel. Weeks, 528 U.S. at 234-36, 120 S.Ct. at 733-34; Buchanan, 522 U.S. at 278-79, 118 S.Ct. at 762-63. There is no dispute that the trial court read OUJI-CR 4-78 to the jury in its closing instructions. Also, the concept of non-unanimity with regard to mitigating evidence was discussed repeatedly in voir dire. What is more, in closing argument, defense counsel repeatedly emphasized that what counted as "mitigating evidence" was personal to each individual juror.[26]
 
  
 
 ¶66 As evidence that the jurors misunderstood the mechanics of considering mitigating circumstances, Appellant points to handwritten notations on Instruction No. 60. This instruction (from OUJI-CR 4-79) listed mitigating factors specifically advanced by the defense. It also reminded the jurors that they could consider, as mitigating evidence, any other fact they might choose. Beside each enumerated mitigator appears a handwritten word, either "No" or "Yes." After the last sentence of this instruction, which encourages jurors to consider any other mitigating factors not already listed, the following handwriting appears: "We feel very sorry for Donnie's family and his little girl." Appellant assumes the jurors treated this list as a verdict form, and that the notations show the jurors were unanimous as to each factor; he infers that the jurors must have believed they had to be unanimous. Appellant does not point to any instruction by the court, or argument by counsel, which might have led jurors to conclude that they had to be unanimous on mitigating circumstances. As we view it, the handwriting on Instruction No. 60 simply confirms that Appellant's jurors did exactly what they are constitutionally required to do: They gave due consideration to each mitigating circumstance advanced and, searching their own hearts, found at least one more. That is all that the law requires.
 
  
 
 ¶67 The instructions and verdict forms in this case did not require, nor did they imply, that unanimity regarding mitigating circumstances was a prerequisite to consideration of those circumstances. We find no reasonable possibility that Appellant's jury was precluded from considering all mitigating evidence in a manner consistent with the Eighth Amendment. Stiles v. State, 1992 OK CR 23, ¶ 58, 829 P.2d 984, 997. Proposition X is denied.
 
 B. Victim impact testimony
 
 ¶68 In Proposition XI, Appellant lodges several complaints about the victim impact evidence presented in the sentencing phase of the trial. We review a trial court's decision to admit victim impact evidence for an abuse of discretion. Malone v. State, 2007 OK CR 34, ¶ 62, 168 P.3d 185, 211. The State presented four victim impact witnesses: Kristi Ferguson's father, stepmother, mother, and brother. Each read a very brief statement about the effect of Ferguson's death on them personally, and on Ferguson's young son. These statements had been reviewed in great detail at a pretrial hearing; defense objections were entertained, and revisions were made. When they were presented to the jury, defense counsel made only a general objection as to content.
 
 ¶69 Appellant first claims it was error to allow Ferguson's stepmother, Rhonda Ferguson, to read a victim impact statement to the jury. He did not object on these grounds below, so our review is only for plain error. Malone, 2007 OK CR 34, ¶ 49, 168 P.3d at 206. This claim is governed by the language of the Oklahoma Victim's Rights Act, 21 O.S.2011, § 142A et seq. A "victim impact statement" is defined in the Act as information about certain effects of a violent crime on each "victim" and members of the victim's "immediate family." 21 O.S.2011, § 142A-1(8). Appellant's argument is based on the fact that at the time of his trial, the list of "immediate family" did not specifically include stepparents. 21 O.S.2011, § 142A-1(4).[27] What Appellant overlooks, however, is that stepparents are, and always have been, considered in the Act to be "victims" themselves when the crime is homicide. See 21 O.S.2011, § 142A-1(1) (a "victim" in a homicide case includes "a surviving family member including a ... stepparent"). Kristi Ferguson's stepmother, Rhonda Ferguson, was herself a "victim" under the Act, and could deliver a victim impact statement. Bosse v. State, 2017 OK CR 10, ¶ 64, 400 P.3d 834, 857. A few months before Appellant's trial, in Miller v. State, 2013 OK CR 11, ¶ 186, 313 P.3d 934, 990-91, we held that it was error to allow a murder victim's stepparent to deliver a victim impact statement in the sentencing phase of a capital trial. We no longer believe Miller was correctly decided on that point, and it is overruled to that extent. What is more, Oklahoma law has long provided that in the sentencing phase of a capital trial, "the state may introduce evidence about the victim and about the impact of the murder on the family of the victim." 21 O.S.2011, § 701.10(C). The term "family" is not defined.[28] There was no error, and no prejudice, here.[29]
 
  
 
 ¶70 Appellant next claims the victim impact evidence as a whole was repetitive and unfairly prejudicial to him. Four family members gave statements; not surprisingly, sadness and loss were common themes. Appellant specifically takes issue with the fact that all four statements mentioned how Ferguson's death had affected her six-year-old son. Yet the statements were all very brief; none was longer than two pages of transcript. We believe their substance, as a whole, was in keeping with what is allowed under the Eighth Amendment. See Payne v. Tennessee, 501 U.S. 808, 831-32, 111 S.Ct. 2597, 2612, 115 L.Ed.2d 720 (1991) (O'Connor, J., concurring).[30]
 
  
 
 ¶71 Finally, Appellant complains that Kristi Ferguson's grandmother was allowed to recommend death as the appropriate sentence. To be precise, her comment -- "Donnie Harris needs to pay for his deed with his life" -- was part of a written statement read into the record by the prosecutor. Appellant made no objection to it at the time. But what Appellant overlooks is that the statement was only given to the trial judge at formal sentencing, after the jury had delivered its verdicts. The State never attempted to elicit such a recommendation in front of the jury.[31] The Eighth Amendment prohibits a capital sentencing jury from considering victim impact evidence that is unrelated to the circumstances of the crime. Booth v. Maryland, 482 U.S. 496, 501-02, 107 S.Ct. 2529, 2532-33, 96 L.Ed.2d 440 (1987), overruled on other grounds by Payne, 501 U.S. 808, 111 S.Ct. 2597 (1991); Selsor v. Workman, 644 F.3d 984, 1026--27 (10th Cir. 2011). Appellant cites no authority extending this rule to statements given at formal sentencing. In conclusion, we find no error in the victim impact testimony. Proposition XI is therefore denied.
 
  
 
 C. Sufficiency of evidence supporting "great risk of death" aggravator
 
 ¶72 Appellant's jury found the existence of both aggravating circumstances alleged by the State. Appellant does not challenge sufficiency of the evidence to support the jury's finding that the murder was especially heinous, atrocious, or cruel. 21 O.S.2011, § 701.12(4). However, in Proposition XII, he challenges the sufficiency of the evidence to support the jury's finding that he knowingly created a great risk of death to more than one person. 21 O.S.2011, § 701.12(2). This argument is meritless. Appellant cannot deny that the fire began in a living area of the home, that several other people were in the home when it started, and that he knew they were there. The fire quickly engulfed the home and destroyed it. The fact that no one but Ferguson was seriously injured is fortuitous, but it does not prevent application of this aggravating circumstance. See Davis v. State, 2011 OK CR 29, ¶ 129, 268 P.3d 86, 121. Having already concluded in the guilt phase of the trial, beyond a reasonable doubt, that Appellant intentionally started the fire, a rational juror could further conclude from the totality of circumstances that the nature and location of the fire created a great risk of death to others. Martinez v. State, 1999 OK CR 33, ¶¶ 2-3, 80, 984 P.2d 813, 818, 832 (upholding "great risk of death" aggravator under similar facts). Proposition XII is denied.
 
 EFFECTIVENESS OF TRIAL COUNSEL
 
 ¶73 In Proposition XIV, Appellant faults his trial counsel's performance on several grounds, and claims he was denied his Sixth Amendment right to reasonably effective counsel.[32] See Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Under Strickland, Appellant must demonstrate: (1) that counsel's performance was constitutionally deficient, and (2) a reasonable probability that counsel's performance caused prejudice -- such that it undermines confidence in the outcome of the trial. Bland v. State, 2000 OK CR 11, ¶ 112, 4 P.3d 702, 730. We begin with the presumption that counsel's conduct fell within the wide range of reasonable professional assistance. Strickland, 466 U.S. at 689, 104 S.Ct. at 2065. Appellant must demonstrate that counsel's choices were unreasonable under prevailing professional norms and cannot be considered sound trial strategy. Id. When a Strickland claim can be disposed of on the ground of lack of prejudice, that course should be followed. 466 U.S. at 697, 104 S.Ct. at 2069.
 
 ¶74 Appellant makes seven separate complaints about his trial counsel. Three are based on the record alone, and four rely on supplemental materials which he has submitted pursuant to Rule 3.11(B)(3), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch.18, App. (2019).[33] We address the record-based claims first. Appellant faults trial counsel for (1) failing to correct the prosecutor's recollection of expert testimony, and her comments on the 85% Rule; (2) failing to object to victim impact testimony and a sentence recommendation from the victim's grandmother; and (3) failing to "confirm" that the jury received complete instructions.[34] Strickland requires proof of both deficient performance and resulting prejudice; failure to demonstrate either is fatal to the claim. Malone v. State, 2013 OK CR 1, ¶ 14, 293 P.3d 198, 206. We have already examined the substantive basis for each of these claims and either found no error, or no reasonable probability of prejudice from error. See our discussion of Propositions VII, X, and XI.[35] Absent error, counsel was not deficient for failing to take other action; absent prejudice, counsel's performance does not undermine confidence in the verdict. These claims are denied.
 
 ¶75 Because Appellant's remaining four ineffective-counsel claims rely on evidence outside the record, we do not reach the merits of these complaints, but only determine whether additional fact-finding regarding them is necessary. Rule 3.11(B), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch.18, App. (2019). Appellant has filed an application for evidentiary hearing pursuant to this Rule. As this Rule explains, there is a strong presumption of regularity in trial proceedings and counsel's conduct. The application must contain sufficient information to show, by clear and convincing evidence, a strong possibility that trial counsel was ineffective for failing to identify or use the evidence at issue. Id., Rule 3.11(B)(3)(b)(i). We thoroughly review the application and accompanying materials. Simpson v. State, 2010 OK CR 6, ¶ 53, 230 P.3d 888, 905. The standard set out above is easier for a defendant to meet than the Strickland standard, as he need only show a strong possibility that counsel was ineffective. Id. at ¶ 53, 230 P.3d at 905-06.
 
 A. Failure to present expert testimony by alternative means
 
 ¶76 Appellant faults trial counsel for not finding some way to present expert testimony on fire investigation when it became clear that his original expert, Smith, would be unable to travel to Oklahoma in time for trial. Appellant claims trial counsel should have had Smith testify remotely, or sought to hire a substitute expert. He presents an affidavit from one of his trial attorneys who says they never gave "serious consideration" to these options. The factual background for this claim is discussed in Proposition II, where Appellant faulted the trial court for not granting him a mistrial. We found no reasonable probability of prejudice from Smith's absence, because his proposed opinions reflected in his pretrial report would not have materially added to defense counsel's cross-examination of Agent Rust's methods and conclusions. Absent prejudice, we need not consider whether trial court's choices were professionally reasonable.[36] Strickland, 466 U.S. at 697, 104 S.Ct. at 2069. Nevertheless, as we observed in Proposition II, such alternatives were considered and rejected by the defense team.[37] Counsel's decision appears to have been a tactical choice made after due consideration and research. As such, it is "virtually unchallengable" on appeal.[38] Strickland, 466 U.S. at 690-91, 104 S.Ct. at 2066. Trial counsel's post hoc affidavit does not change our assessment. Rule 3.11(B)(3)(b), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch.18, App. (2019); Simpson, 2010 OK CR 6, ¶ 53, 230 P.3d at 905-06.
 
 B. Failure to "confirm" that physical evidence was available
 
 ¶77 As noted in Proposition III, the parties stipulated before trial to introducing photographs of physical evidence collected at the scene and on Appellant's arrest. That evidence was eventually lost or destroyed. Appellant claims his trial counsel was ineffective for "failing to confirm" that this physical evidence existed before entering into the stipulation. We fail to see the logic in this argument. Appellant does not fault trial counsel for stipulating per se. By virtue of the stipulation, the evidence itself was not made part of the record.
 
 ¶78 Trial counsel's job is to make decisions based on reasonable investigation of the evidence and legal issues. Courts must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. Strickland, 466 U.S. at 690, 104 S.Ct. at 2066. There may be countless ways to provide effective assistance in any given case. 466 U.S. at 689, 104 S.Ct. at 2065. There comes a point where counsel may reasonably decide that one strategy is in order, thereby making additional efforts toward some other strategy unnecessary. Id. at 691, 104 S.Ct. at 2066. It is not counsel's duty to somehow preserve every conceivable tactic or argument that was ultimately discarded.
 
 ¶79 As discussed in Proposition III, neither defense counsel nor their expert felt the need to even inspect the physical evidence, much less have it tested in any way. Trial counsel had no responsibility -- or control -- over the preservation of evidence he did not reasonably feel was relevant to the jury's task. Even if counsel had asked to examine the evidence before trial, only to learn that it could not be located, we have already considered and rejected the merits of Appellant's claim that the loss of this evidence rendered his trial fundamentally unfair. See Proposition III. The extra-record material related to this claim does not alter our conclusion. Rule 3.11(B)(3)(b), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch.18, App. (2019); Simpson, 2010 OK CR 6, ¶ 53, 230 P.3d at 905-06.
 
 C. Failure to demand access to Agent Rust's personnel file
 
 ¶80 Trial counsel filed an omnibus discovery motion seeking, among other things, "all evidence tending to impeach the credibility of each potential witness." Appellant maintains it was the prosecutor's duty to find impeaching evidence in Agent Rust's personnel file and supply it to the defense, see Proposition IV, but here he alternatively faults trial counsel for not making sure that the prosecutor fulfilled her duty. How trial counsel was supposed to demand the production of information he did not know existed is not clear. The Fifth Amendment does not guarantee defense counsel the right to unfettered inspection of the State's files. Weatherford v. Bursey, 429 U.S. 545, 559, 97 S.Ct. 837, 846, 51 L.Ed.2d 30 (1977). On the other hand, Brady obligates the State to disclose material, exculpatory evidence regardless of whether a defendant asks for it. United States v. Bagley, 473 U.S. at 682, 105 S.Ct. at 3383; Douglas v. Workman, 560 F.3d at 1172. Any fault here would properly lie with the prosecutor, not defense counsel, and we have already addressed that issue in Proposition IV. The materials submitted in support of this claim do not raise a strong possibility that counsel was ineffective. Rule 3.11(B)(3)(b); Simpson, 2010 OK CR 6, ¶ 53, 230 P.3d at 905-06.
 
 D. Failure to present a neuropsychological expert
 
 ¶81 In the capital sentencing stage of the trial, the defense presented testimony from Dr. Jeanne Russell and Dr. Janice Garner. Dr. Russell, a psychologist, interviewed and conducted various tests on Appellant. Dr. Garner, who specializes in compiling mitigation evidence in capital cases, provided the jury with a summary of Appellant's upbringing and family life, based on interviews with family and other information. Appellant now claims trial counsel were deficient in failing to adequately investigate Fetal Alcohol Syndrome as a part of the mitigation case. He submits affidavits from an investigator who worked with trial counsel, Dr. Russell, and another expert consulted by the trial defense team, stating that they believe this subject should have been explored in greater detail. Appellant also submits a report from Dr. John Fabian, a neuropsychologist who examined Appellant in August 2015. In Dr. Fabian's opinion, Appellant may suffer from a "neurodevelopmental disorder" because his mother allegedly drank alcohol while pregnant with him. Finally, Appellant submits affidavits from friends and family (many of whom testified at trial), which Fabian appears to have relied upon when compiling his report. Appellant faults trial counsel for not presenting this or similar evidence to his jury.
 
 ¶82 The record shows that the possibility of Fetal Alcohol Syndrome was, in fact, explored by the experts defense counsel consulted. Both Drs. Russell and Garner investigated Appellant's mental health and cognitive ability as mitigating factors. Both specifically addressed Fetal Alcohol Syndrome in their testimony. Both said they had received information (presumably, from the same friends and family who provided affidavits to Dr. Fabian) that Appellant's mother, who died in 2011, drank alcohol to some extent while pregnant with Appellant. Both had access to Appellant and to others who could describe his apparent intellectual abilities. Yet, neither Dr. Russell nor Dr. Garner found evidence that Appellant suffered any developmental deficiencies that might convincingly be attributed to Fetal Alcohol Syndrome. (There was also no evidence that Appellant suffered from any mental illness.) Dr. Russell administered a universally accepted intelligence test (WAIS-IV) which, she explained, samples a number of different cognitive skills. Russell confirmed family members' opinions that Appellant had difficulty understanding complicated concepts. Nevertheless, she found Appellant's intellectual ability to be generally in the low-average range. She found no evidence of developmental disability.
 
 ¶83 Dr. Fabian conducted a battery of tests to gauge Appellant's functioning at a variety of tasks. While these tests often placed Appellant in categories such as "low average," "mild impairment," or "mild to moderate impairment" when compared to the general population, these results were not inconsistent with Dr. Russell's own test-based opinion; Dr. Fabian simply confirmed Appellant's mild impairment in more discrete and subtle ways. As for whether and how often Appellant's mother drank alcohol during pregnancy, Dr. Fabian appears to have been limited to the same anecdotal source information available to Drs. Russell and Garner. In the end, Dr. Fabian could not conclusively point to prenatal alcohol exposure as the cause of Appellant's mild cognitive impairment. Rather, he appears to have concluded merely that prenatal exposure to alcohol might have contributed to that impairment. He conceded that Appellant might simply be suffering from "Fetal Alcohol Effect," considered to be a milder form of Fetal Alcohol Syndrome. Dr. Fabian also conceded that Appellant's mental problems were likely exacerbated by drug and alcohol abuse, which he also documented. In any event, the fact that Appellant suffers from mild intellectual deficits, whatever the cause, was never disputed.
 
 ¶84 Of course, whether Appellant was exposed to alcohol before birth is not, by itself, a mitigating factor. Rather, the search is for some fact which might explain or at least contribute to a particular manifestation or condition, such as cognitive impairment -- a condition that might resonate with jurors and cause them to hold the defendant less culpable or more deserving of mercy. We simply do not believe Dr. Fabian's report materially assists in that regard. Dr. Fabian could suggest, but not confirm, that prenatal exposure to alcohol contributed to Appellant's cognitive difficulties. But the difficulties themselves were apparently not so great as to cause concern to the experts whom trial counsel consulted.
 
 ¶85 To obtain relief under Rule 3.11(B), a defendant need only show a "strong possibility" that trial counsel was ineffective. But Strickland contains the benchmarks for deciding what "ineffective" means. As we have noted, Strickland starts with the presumption that counsel acted reasonably and professionally, and grants considerable deference to strategic choices made after reasonable investigation. Strickland, 466 U.S. at 689, 104 S.Ct. at 2065. Rule 3.11(B) echoes that presumption. Appellant must show a strong possibility that counsel's choices were unreasonable under prevailing professional norms, and cannot be considered sound trial strategy. Id. If counsel's strategic decisions are based on reasonably adequate investigation, then those decisions are "virtually unchallengeable" on appeal. 466 U.S. at 690-91, 104 S.Ct. at 2066. We must defer to reasonable trial strategies, and not second-guess them with the benefit of hindsight. Id. at 689, 104 S.Ct. at 2065. Counsel has a duty to make reasonable investigations, or to "make a reasonable decision that makes particular investigations unnecessary." 466 U.S. at 691, 104 S.Ct. at 2066. Counsel cannot be expected to undertake an investigation that he reasonably believes would be fruitless. Id. 
 
 ¶86 This is not a case involving lack of capital trial experience on the part of counsel, lack of funds or professional resources, or lack of focus. Appellant had two experienced capital trial attorneys defending him. They, in turn, had the resources of the Oklahoma Indigent Defense System to help them marshal their defense. Counsel consulted with and presented considerable testimony (exceeding sixty pages of transcript) from two professionals, both of whom considered Fetal Alcohol Syndrome within the context of their respective fields. We believe trial counsel conducted reasonable investigation into this subject. The fact that counsel might have been able to locate some other expert with an arguably different opinion does not render their efforts deficient. Ultimately, neither Dr. Russell nor Dr. Garner found evidence of mental impairment substantial enough to warrant further inquiry. Trial counsel made a reasonable strategic choice not to continue shopping for other opinions.[39]
 
  
 
 ¶87 Strickland also instructs that even professionally unreasonable decisions by counsel do not necessarily result in prejudice. We recognize the extremely broad scope of capital mitigation evidence. Buchanan, 522 U.S. at 276, 118 S.Ct. at 761. Few restrictions are placed on the defendant when his own life is at stake, and rightly so. Almost anything might be offered as mitigation evidence; but that does not mean that everything possible can or should be offered as mitigation evidence. It also does not mean that anything not presented was outcome-determinative. While Dr. Fabian concluded that a particular cause contributed to Appellant's cognitive state, we do not find that cognitive state was markedly unusual or debilitating; if it had been, it seems likely that Dr. Garner would have noticed it.[40]
 
  
 
 ¶88 Also, with regard to the probable effect of such evidence, there are portions of Dr. Fabian's investigation and report that might have done more harm than good at trial. Most notably, Appellant had a considerable history of drug use. In particular, he and Ferguson routinely used methamphetamine; Appellant even said he had manufactured and sold the drug. As for the long-term effects of alcohol, some of Appellant's impairment may have been self-inflicted: he reported that he drank beer daily as an adult. Dr. Fabian noted that Appellant's self-reporting of substance abuse was inconsistent, suggesting an attempt to minimize its frequency. Also, Appellant's former girlfriend reported that he went through a period of "huffing" gasoline fumes as a teenager. Dr. Fabian also concluded that Appellant "did not display impairment" on a test for impulsive decision-making. Given that the facts in this case suggest an impulsive act of rage, that finding might have been of particular interest to the jury.[41]
 
  
 
 ¶89 Here, counsel made a sound strategic choice, presumably based on what Drs. Garner and Russell concluded, not to expend any more time trying to identify a possible neurological cause for an effect (mild cognitive impairment) that was never seriously disputed -- and which, given the balance of the evidence, cannot reasonably be said to have had a discernible impact on Appellant's ability to manage his affairs, control his emotions, or appreciate the consequences of his acts. See e.g. Murphy v. State, 2002 OK CR 32, ¶ 19 n.8, 54 P.3d 556, 564-65 n.8 (where evidence of Fetal Alcohol Syndrome was ambiguous, particularly before trial, when defense counsel was initially investigating the issue).[42] Having considered Dr. Fabian's report, we do not find a strong possibility that such evidence would have cast Appellant's culpability in a materially different light. Malone, 2007 OK CR 34, ¶ 114, 168 P.3d at 229-230. Hence, we find no strong possibility that counsel was ineffective. Rule 3.11(B)(3)(b), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch.18, App. (2019); Simpson, 2010 OK CR 6, ¶ 53, 230 P.3d at 905-06.
 
  
 
 ¶90 In summary, the supplementary materials Appellant has presented to this Court do not show a strong possibility that trial counsel was ineffective, to the extent that additional fact-finding on the issue would be warranted. Proposition XIV is denied, and Appellant's request for an evidentiary hearing is also denied. Rule 3.11, Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch.18, App. (2019); Simpson, 2010 OK CR 6, ¶ 53, 230 P.3d at 905-06.
 
 CONSTITUTIONAL CHALLENGES TO THE DEATH PENALTY
 
 ¶91 In Proposition XIII, Appellant claims that Oklahoma law defining the "especially heinous, atrocious, or cruel" (HAC) aggravating circumstance is so vague that it cannot be applied in a constitutionally fair manner. He also complains that the aggravating circumstance is defective because it has no intent requirement. We have rejected similar challenges to this aggravator before. The current Uniform Jury Instructions defining the HAC aggravator are sufficient to meaningfully narrow the sentencing jury's discretion. Cuesta--Rodriguez, 2010 OK CR 23, ¶ 80, 241 P.3d at 238--39. To support the HAC aggravator, the State must prove beyond a reasonable doubt that the defendant inflicted either torture (great physical anguish or extreme mental cruelty), or serious physical abuse, and in cases of great physical anguish or serious physical abuse, that the victim experienced conscious physical suffering before death. Cuesta--Rodriguez, 2010 OK CR 23, ¶ 78, 241 P.3d at 238; see also Medlock v. Ward, 200 F.3d 1314, 1321 (10th Cir. 2000) (holding that the HAC aggravator, defined in this manner, can provide a "principled narrowing" of the class of persons eligible for a death sentence).
 
 ¶92 Appellant claims the HAC aggravator cannot apply unless he harbored a specific intent to cause such anguish, but he is mistaken. In fact, Ferguson's murder can be deemed "especially heinous, atrocious, or cruel" even though Appellant was charged under a felony-murder theory -- i.e., without any allegation or proof that he harbored a specific intent to kill (much less cause anguish to) his victim. E.g. Harmon v. State, 2011 OK CR 6, ¶ 1, 248 P.3d 918, 926; Wood v. State, 2007 OK CR 17, ¶ 1, 158 P.3d 467, 470-71; DeRosa v. State, 2004 OK CR 19, ¶ 1, 89 P.3d 1124, 1129; Romano, 1995 OK CR 74, ¶ 90, 909 P.2d 92, 122. There was no dispute that Ferguson was in extreme pain when she ran to a neighbor's house, with clothing melted to her skin and flesh falling from her body. She languished for days before succumbing to her injuries. The evidence amply supports a conclusion that Ferguson experienced great physical anguish for an extended period of time before she died. Duvall v. State, 1991 OK CR 64, ¶¶ 38-39, 825 P.2d 621, 634. Proposition XIII is denied.
 
 ¶93 In Proposition XVI, Appellant claims that the death penalty in general is cruel and unusual punishment, violating the Eighth Amendment to the United States Constitution and corresponding provisions of the Oklahoma Constitution. Specifically, he identifies four concerns: (1) the death penalty is unreliable because it may be imposed on those who are factually innocent; (2) the death penalty is arbitrarily imposed, at times on those undeserving of it; (3) the death penalty is "cruel" because execution is preceded by long delays, and while such delays enhance the reliability of its application, any deterrent effect the penalty might have is necessarily undermined; and (4) the death penalty is "unusual," as evidenced by a decline in its use nationwide. As authority for these claims, Appellant relies exclusively on concerns raised by Justice Breyer in his dissenting opinion in Glossip v. Gross, -- U.S. --, 135 S.Ct. 2726, 2755, 192 L.Ed.2d 761 (2015). We have rejected similar attacks on the death penalty before. See e.g. Postelle v. State, 2011 OK CR 30, ¶ 88, 267 P.3d 114, 145; Harmon v. State, 2011 OK CR 6, ¶ 87, 248 P.3d 918, 945; Stouffer v. State, 2006 OK CR 46, ¶ 208, 147 P.3d 245, 281. Because Appellant's argument is more about public policy than controlling law, it is better directed to our state legislature. Williams v. State, 2001 OK CR 24, ¶ 20, 31 P.3d 1046, 1051-52. Proposition XVI is denied.
 
 MOTION FOR NEW TRIAL
 
 ¶94 Simultaneously with his Brief and his Application for Evidentiary Hearing, Appellant filed a Motion for New Trial based on what he claims is newly discovered evidence: (1) personnel information concerning Agent Rust, and (2) more pieces of a glass liquor bottle which have since been discovered at the fire scene. A defendant may seek a new trial in limited situations where his "substantial rights have been prejudiced," including when "new evidence is discovered, material to the defendant, and which he could not with reasonable diligence have discovered before the trial." 22 O.S.2011, § 952(7). The motion may be made within three months after the evidence is discovered, but must be filed within one year after judgment is rendered.[43] 22 O.S.2011, § 953.
 
 ¶95 With regard to the materials concerning Agent Rust, the timeliness of Appellant's motion is moot. We have already considered these materials under Rule 3.11(A) in conjunction with Appellant's Brady claim. See Proposition IV. However, with regard to the physical evidence Appellant offers as "newly discovered," his motion is untimely. According to an affidavit supplied by Appellant's investigator, the evidence was discovered in August 2015. Even if Appellant had immediately filed his motion, well over a year had already passed since his formal sentencing in February 2014. The motion is also untimely because it was filed in March 2017 -- considerably longer than three months after the evidence was discovered. This Court is without jurisdiction to consider this evidence in its present posture.[44] Owens v. State, 1985 OK CR 114, ¶ 7, 706 P.2d 912, 913. Appellant's Motion for New Trial is DISMISSED for lack of jurisdiction.[45]
 
  
 
 CUMULATIVE ERROR AND MANDATORY SENTENCE REVIEW
 
  
 
 ¶96 In Propositions XV and XVII, Appellant claims that the cumulative effect of all errors identified above resulted in the arbitrary, emotion-driven, and unconstitutional imposition of the death penalty. Our mandatory sentence review in capital cases, see 21 O.S.2011, § 701.13, requires us to determine whether Appellant's death sentence was improperly influenced by "passion, prejudice or any other arbitrary factor," and whether the evidence supports the jury's findings as to aggravating circumstances. Having reviewed the record in this case, we find no reasonable probability that the jury's verdict was influenced by evidentiary error, prosecutor misconduct, or any other improper factor. The jury's findings as to both aggravating circumstances are supported by the evidence, and a rational juror could conclude, beyond a reasonable doubt, that the death sentence was appropriate here, even in light of the mitigating evidence presented. Cuesta-Rodriguez, 2010 OK CR 23, ¶¶ 110-113, 241 P.3d at 246-47. Propositions XV and XVII are denied.
 
 
 
 
 DECISION
 
 ¶97 Appellant's Notice of Extra-Record Evidence/Application for Evidentiary Hearing is DENIED. His Motion for New Trial is DISMISSED for lack of jurisdiction. His Notice to Court Regarding Missing Evidence and Request to Remand, filed September 26, 2018 is DENIED. The Judgment and Sentence of the District Court of LeFlore County is AFFIRMED. Pursuant to Rule 3.15, Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch.18, App. (2019), the MANDATE is ORDERED issued upon the delivery and filing of this decision.
 
 AN APPEAL FROM THE DISTRICT COURT OF LEFLORE COUNTY
 
 THE HONORABLE JONATHAN K. SULLIVAN, DISTRICT JUDGE
 
 
 
 
 
 ATTORNEYS AT TRIAL
 
 PETER ASTOR
 
 JAMES BOWEN
 
 CAPITAL TRIAL DIVISION
 
 OKLAHOMA INDIGENT DEFENSE SYSTEM
 
 610 S. HIAWATHA ST.
 
 SAPULPA, OKLAHOMA 74066
 
 COUNSEL FOR DEFENDANT
 
 MARGARET NICHOLSON
 
 ASST. DISTRICT ATTORNEY
 
 LEFLORE COUNTY DISTRICT ATTORNEY'S OFFICE
 
 P.O. BOX 880
 
 POTEAU, OKLAHOMA 74953
 
 COUNSEL FOR THE STATE
 
 
 
 ATTORNEYS ON APPEAL
 
 KRISTI CHRISTOPHER
 
 RAYMOND E. DENECKE
 
 OKLAHOMA INDIGENT DEFENSE SYSTEM
 
 P.O. BOX 926
 
 NORMAN, OKLAHOMA 73070
 
 COUNSEL FOR APPELLANT
 
 MIKE HUNTER
 
 ATTORNEY GENERAL OF OKLA.
 
 JOSHUA L. LOCKETT
 
 ASST. ATTORNEY GENERAL
 
 313 NE 21ST STREET
 
 OKLAHOMA CITY, OK 73105
 
 COUNSEL FOR APPELLEE
 
 
 
 
 
  
 
 OPINION BY KUEHN, V.P.J.
 
 LEWIS, P.J.: CONCUR
 
 LUMPKIN, J.: CONCUR IN RESULTS
 
 HUDSON, J.: CONCUR
 
 ROWLAND, J.: CONCUR
 
 
 FOOTNOTES
 
 
 [1] Appellant does not challenge the voluntariness of any of his statements to authorities.
 
 
 
 [2] When Saulsberry asked Appellant why he was telling Ferguson to "shut the fuck up" when she was asking the neighbors for help, Appellant claimed he was talking to the neighbors, not Ferguson, because (he claimed) they were demanding that Ferguson leave their property.
 
 
 
 [3] Hearings were held December 10, 2014; December 23, 2015; and May 13, 2016.
 
 
 
 [4] In Black, a capital defendant claimed prejudicial error from the fact that a number of events were not transcribed for the record, including bench conferences, rulings, the exercise of peremptory challenges, and the selection of alternate jurors. We rejected Black's claim that the omissions were so great as to impede either his right to appeal or this Court's duty to review. We observed that Black had failed to identify any evidentiary or other ruling which depended on some unrecorded portion of the proceedings. Id. at ¶¶ 85, 87, 88, 21 P.3d at 1075-76. We reached the same conclusion in Parker, cited above. Parker, 1994 OK CR 56, ¶¶ 23-27, 887 P.2d at 294-95.
 
 
 
 [5] The purpose of pretrial motion hearings is usually to resolve (at least preliminarily) issues about what evidence will be admissible at trial. But such rulings are always subject to change. Cuesta-Rodriguez v. State, 2010 OK CR 23, ¶ 86, 241 P.3d 214, 240. Whatever rulings may have come out of the December 4, 2013 hearing, the bottom line is whether or not Appellant received a fair trial. Appellant fails to connect anything that might have transpired at the hearing with any ruling or decision that affected the trial itself. Similarly, with regard to perceived "omissions" in voir dire, the purpose of voir dire is to discover any grounds to challenge prospective jurors for cause, and to permit the intelligent use of peremptory challenges. Harmon v. State, 2011 OK CR 6, ¶ 7, 248 P.3d 918, 927. Yet Appellant raises no complaints whatsoever about the selection of his jury.
 
 
 
 [6] As early as December 11, defense counsel took the position that agreeing to anything less than Smith's physical presence on the witness stand would be strategically unwise. And the motion for mistrial stated, in relevant part:
 
 The defendant is not in the position to waive the right to compulsory process with regard to the critical fire causation expert. ... Defendant's right to have a favorable expert witness testify in-court would be waived if he acquiesced... . Under the case law counsel has been able to find, if a [sic] telecommunications testimony was agreed to, it would require the defendant to waive his right to compulsory process which again he is not in a position to do. (Emphasis in original) ...
 
 We become ineffective if required to make the decision not to call the expert at all, or we are ineffective for waiving defendant's right to compulsory process which is [the] result of agreeing to tele-testimony as opposed to the importance and necessity of the physical presence of the expert witness. (Emphasis added)
 
 At the December 13 conference, counsel referred to Harris v. State (cited above). Counsel read Harris as holding that he would be acting deficiently if he agreed to have Smith testify remotely. But that is not what Harris holds. In Harris, the defendant claimed he was denied his right to an impartial jury, and one undistracted from national events, when the trial court refused to declare a mistrial (or at least adjourn for a few days) after the September 11 terrorist attacks interrupted the proceedings. We rejected that claim. In passing, Harris claimed he was "forced" to accept remote testimony of two defense witnesses -- but he never claimed he was denied his constitutional right to confront witnesses or present a defense. Harris does not hold that a defendant has an unqualified right to personal attendance of witnesses unless he agrees to relinquish it. The fact that Harris agreed to remote testimony does not mean that his case would have been reversed if he had objected.
 
 
 
 [7] The possibility of an accidental ignition source is one thing; but how Ferguson ended up with gasoline all over her body is a different matter entirely. One can speculate about electrical sparks or upended candles, but one must still account for the shattered bottle of gasoline and the kinds of burns Ferguson exhibited and the statements she made. The State believed Appellant intentionally caused both events. Smith's report acknowledges the indisputable -- the "probable presence of an ignitable liquid" -- and agrees that how the liquid got on Ferguson is an important question. But even Smith is unable to offer a cogent alternative theory in this regard. He declares that "cognitive testing to identify alternate sources of ignition energy and to scientifically eliminate those other potential sources has not been accomplished." But as far as we can tell from Smith's introductory methodology, "cognitive" testing (as opposed to "experimental" testing) simply means thinking about the possibilities. Smith's report concludes that "the origin of a fire must be established before a cause can be opined." He faults Agent Rust for not more thoroughly investigating possible ignition sources besides Appellant's cigarette lighter. But again, Smith's conclusion is simply that Rust didn't consider alternative scenarios; Smith never offered any of his own, including how Ferguson came to be covered in gasoline.
 
 
 
 [8] Appellant's citation to United States v. West, 828 F.2d 1468 (10th Cir. 1987) is instructive; the facts in that case differ markedly from those here. West was charged with murdering another man during a motorcycle-gang brawl. Testimony varied on who was involved in the fracas, and who threw the fatal blow to the victim's skull. Id. at 1468-69. On the second day of trial, West asked for a one-day continuance to obtain the attendance of another eyewitness who was expected to testify that West did not hit the victim. Id. at 1469. The witness had been orally advised to appear January 14 (the day that the continuance was requested), but his subpoena stated January 15. Id. The appellate court concluded that the trial court abused its discretion in refusing to grant a one-day continuance under the circumstances; the confusion was understandable, the requested delay was very brief, and the eyewitness testimony at issue was critical to the defense. Id. at 1470-71.
 
 Appellant also refers us to Baker v. State, 1977 OK CR 304, 572 P.2d 233. But again, the fundamental unfairness in refusing to grant a continuance in that case is apparent. First, the State was granted a continuance to secure its own witnesses. Defense counsel released his witnesses until the next trial setting. The judge's continuance was countermanded by his superior, and the trial date was moved up several weeks. Defense counsel could not contact his witnesses in time for the court's advanced trial date, and thus was unable to present them at trial. This Court found an abuse of discretion because the missing witnesses would have provided key testimony establishing a complete defense to the charge. 1977 OK CR 304, ¶¶ 5-9, 572 P.2d at 234-35.
 
 
 
 [9] Appellant also claims two collateral results of the alleged Due Process violation: first, that defense counsel was prevented from providing effective assistance, and second, that the court's ruling had a "chilling effect" on Appellant's decision about whether to testify. Appellant does not elaborate on these claims or cite any authority to support them. Because we find the court's ruling was within its discretion, we need not consider these arguments further. We do, however, consider the reasonableness of defense counsel's strategy in Proposition XIV.
 
 
 
 [10] We remanded the case to determine if this evidence could be found, but it could not.
 
 
 
 [11] Appellant relies heavily on post-hoc speculation to argue that this evidence has exculpatory value. He claims that a defense investigator found additional pieces of a Crown Royal bottle, at what remains of the fire-gutted home, in August 2015 -- over three years after the fire. We address this new evidence below, in our discussion of Appellant's Motion for New Trial. Appellant may claim that new evidence is somehow "exculpatory," but our concern here is whether the evidence that was in the State's possession had exculpatory value which was apparent at the time the evidence was lost. If it did not, then Appellant must demonstrate bad faith in its loss.
 
 
 
 [12] The only piece of physical evidence that appears to have been admitted as an exhibit at trial is Appellant's lighter (State's Exhibit 9), although only a photograph of the lighter is included in the appeal record. Ironically, defense counsel (who conceded having had an opportunity to inspect the lighter before trial) actually objected to admission of the lighter, arguing that it may have been tampered with or contaminated since its confiscation. See Proposition VIII.
 
 
 
 [13] In a nutshell, Appellant alleges that at some point after this trial, Agent Rust amended his own records concerning whether, and when, he received the physical evidence from the OSBI after testing, evidence which was returned sometime in May 2012. Appellant does not challenge the integrity of the testing itself; he only complains that physical evidence relevant to this case was subsequently lost or destroyed by LeFlore County authorities.
 
 
 
 [14] According to testimony at the December 2015 evidentiary hearing, Agent Rust had been reprimanded by his employer in 2009 for lax investigation in another case. But this testimony also showed Rust had investigated around 900 other fires without any complaints about his performance. In any event, Rust was required to undergo additional training. This was some three years before his participation in this case. In addition, Appellant points to the prosecutor's own testimony at the same hearing, where she described having "issues" with Rust when she briefly supervised him some time before 2009. Exactly what those issues were is not fully developed.
 
 
 
 [15] See United States v. Lawson, 810 F.3d 1032 (7th Cir. 2016). Lawson was convicted of robbing a post office. He left his cell phone and fingerprints at the scene. On appeal, Lawson claimed the government withheld evidence that the detective who lifted the fingerprints had a record of disciplinary actions in his personnel file, and that this information affected the detective's credibility. The Seventh Circuit concluded that the information was not material under Brady. It noted that the detective's role in the case was simply to gather evidence, and that the identification of the fingerprints as belonging to the defendant was made by someone else. Id. at 1043-44. Appellant's reliance on Vaughn v. United States, 93 A.3d 1237 (D.C. 2014), is misplaced for similar reasons. In Vaughn, a prosecution stemming from a prison assault, the court found that undisclosed information affecting a prison guard's credibility was not material as to one defendant, because the only relevant information that the guard provided (identification of the defendant as being present during the assault) was admitted by Vaughn in a post-trial affidavit. Vaughn, 93 A.3d at 1266. Here, Appellant stipulated that the physical evidence collected by Agent Rust need not be introduced at trial, and he had no challenge to the OSBI's test results. Appellant also cites Milke v. Ryan, 711 F.3d 998 (9th Cir. 2013), but that case is readily distinguishable. Milke was convicted and sentenced to death for taking part in the murder of her young son. No witnesses or physical evidence directly linked her to the crime; rather, the case was (in the Ninth Circuit's words) a "swearing contest" between Milke and a police detective, who claimed Milke confessed the crime to him. The detective's credibility was clearly key to the state's case -- yet neither the defense nor the jury knew about the detective's "long history of lying under oath and other misconduct." Id. at 1000-01. Under those circumstances, the Ninth Circuit understandably found the state's failure to disclose the detective's track record to be material to the outcome of the trial. Id. at 1018-19.
 
 
 
 [16] No details of the grounds for the application were offered into evidence.
 
 
 
 [17] Appellant's real complaint here seems to be lack of foundation, not hearsay. He claims that Turner never affirmatively swore to personal knowledge of these events. Personal knowledge is generally a prerequisite to the admissibility of a witness's testimony. 12 O.S.2011, § 2602. But reading Turner's testimony in full, we find no reason to believe she was not describing events that she witnessed.
 
 
 
 [18] The trial was structured so that if the jury found Appellant guilty of a lesser, non-capital offense, it would assess punishment at that time.
 
 
 
 [19] In the first-stage closing argument, the prosecutor said (with emphasis added):
 
 As long as we're talking about lesser includeds then we have to talk about the punishment about [sic] the lesser includeds. ... For purposes of calculating under the 85% Rule, we give you a definition of life, okay. If you convict somebody of a crime that is under the 85% Rule, which two of these are, then you've got to know what DOC is going to do, and DOC is going to say I can't mathematically formulate .85 times l-i-f-e -- doesn't work. What number do I use? So they have arbitrarily come up with the number 45. So if you write down the word l-i-f-e, that is what DOC will substitute to determine when he's eligible for parole or good time credits or any of those things. ...
 
 In second-stage closing, the prosecutor said:
 
 I have to talk about this 85% instruction one more time. I'll talk briefly because I already told you yesterday. 85% instruction only applies if you give him life with parole, you are [inaudible] here; if you write down with life [sic], they're going to say, well, that means 45 and that's the number they're going to give him. You are not committed to 45; instead of life you can write down 50, 60 or 6000 or whatever number you have. So that's when the 85% -- but it doesn't apply to the other two.
 
 Appellant's reliance on Florez v. State, 2010 OK CR 21, 239 P.3d 156, is misplaced. In Florez, the prosecutor told the jury that the defendant "will only do 85 percent of what you give him" -- erroneously suggesting that parole was guaranteed. 2010 OK CR 21, ¶ 5, 239 P.3d at 158. We found the error harmless since the jury's sentence recommendation was half of what the prosecutor had requested, and considerably lower than the maximum term available. 2010 OK CR 21, ¶ 9, 239 P.3d at 159.
 
 
 
 [20] The trial court said, "And I'll speak with the family; if they're not going to be able to be composed, then they're not going to be able to be in here. It's disruptive." Defense counsel replied, "I understand."
 
 
 
 [21] Appellant mistakenly claims there were two outbursts. Ferguson's mother appears to have left the courtroom and returned moments later as the prosecutor was still questioning Johnson. While defense counsel approached the bench and expressed concern that Ferguson's mother might get "riled up and crying before this jury again," there is no indication that this occurred. In fact, the trial court responded, "If she disrupts again, she's going to be removed for the remainder of the trial."
 
 
 
 [22] OUJI-CR 4-78 reads:
 
 Mitigating circumstances are 1) circumstances that may extenuate or reduce the degree of moral culpability or blame, or 2) circumstances which in fairness, sympathy or mercy may lead you as jurors individually or collectively to decide against imposing the death penalty. The determination of what circumstances are mitigating is for you to resolve under the facts and circumstances of this case.
 
 While all twelve jurors must unanimously agree that the State has established beyond a reasonable doubt the existence of at least one aggravating circumstance prior to consideration of the death penalty, unanimous agreement of jurors concerning mitigating circumstances is not required. In addition, mitigating circumstances do not have to be proved beyond a reasonable doubt in order for you to consider them.
 
 
 
 [23] This instruction has since been reworded and clarified. OUJI-CR 4-80.
 
 
 
 [24] We noted in Cleary that while Oklahoma law provides that jury instructions "shall be in writing," see 22 O.S.2011, § 831(6), the jury was permitted, but not required, to take written copies of the instructions to the deliberation room. See 22 O.S.2011, § 893.
 
 
 
 [25] In 1996, the drafters of the Second Edition of the Oklahoma Uniform Jury Instructions concluded that language on non-unanimity as to mitigating circumstances would be helpful to a capital jury -- while at the same time conceding that this Court had repeatedly held no such instruction was necessary. See OUJI-CR 4-78, Notes on Use; Hooper v. State, 1997 OK CR 64, ¶ 51 n.65, 947 P.2d 1090, 1109 n.65.
 
 
 
 [26] E.g.,
 
 [Y]ou never have to impose the death penalty. ... And essentially, what that's allowing you to do is, all right, we found the aggravators, and before I get to my own personal moral belief, which we talked a lot about up in voir dire, what you twelve individually feel is right and just, which you can find collectively or not so... . [I]n your own reasonable moral judgment, in your own personal moral judgment, you can consider the mitigators, and that is what would lessen the culpability.
 
 
 
 [27] In 2014, our Legislature specifically added stepparents and some other relatives to this list. Laws 2014, SB 1824, c. 258, § 1 (eff. November 1, 2014).
 
 
 
 [28] The applicability of this statute was not affected by the Victim's Rights Act. In 2013, the Legislature added language to § 701.10 to underscore its application in cases where the death penalty was sought. Laws 2013, SB 1036, c. 6, § 1 (eff. November 1, 2013).
 
 
 
 [29] Defense counsel's lack of objection suggests he correctly understood that Rhonda Ferguson was a "victim" in this case. ("I'm not disputing that a stepmother and brother and grandmother cannot [sic] make statements. ... I know the statute talks about that those members can make a statement.") Rhonda Ferguson read a brief prepared statement, comprising about one page of transcript, about how Kristi's death affected her, then turned to how Kristi's son dealt with the loss of his mother, which itself is a completely appropriate topic for victim impact testimony. 21 O.S.2011, § 142A-1(8), § 701.10(C).
 
 
 
 [30] In her concurring opinion in Payne, Justice O'Connor wrote:
 
 We do not hold today that victim impact evidence must be admitted, or even that it should be admitted. We hold merely that if a State decides to permit consideration of this evidence, "the Eighth Amendment erects no per se bar." ... If, in a particular case, a witness' testimony or a prosecutor's remark so infects the sentencing proceeding as to render it fundamentally unfair, the defendant may seek appropriate relief under the Due Process Clause of the Fourteenth Amendment.
 
 That line was not crossed in this case. The State called as a witness Mary Zvolanek, Nicholas' grandmother. Her testimony was brief. She explained that Nicholas cried for his mother and baby sister and could not understand why they did not come home. I do not doubt that the jurors were moved by this testimony -- who would not have been? But surely this brief statement did not inflame their passions more than did the facts of the crime... .
 
 Payne, 501 U.S. at 831-32, 111 S.Ct. at 2612.
 
 
 
 [31] At the beginning of the hearing on victim impact statements, the prosecutor agreed to remove any such recommendations from statements to be read to the jury, citing Lockett v. Trammell, 711 F.3d 1218 (10th Cir. 2013).
 
 
 
 [32] Appellant had two experienced capital trial lawyers from the Oklahoma Indigent Defense System appointed to his case. We generally refer to them collectively as "counsel."
 
 
 
 [33] The Rule 3.11 application contains not only supplementary materials, but also more than twenty pages of additional argument. We have long looked with disfavor on attempts to evade page-limitation requirements for briefs (already permitted to be 100 pages in capital cases) by incorporating arguments made in this manner. See Garrison v. State, 2004 OK CR 35, ¶ 131 n.36, 103 P.3d 590, 612 n.36.
 
 
 
 [34] Parts E, F, and G, respectively, of Proposition XIV of Appellant's Brief.
 
 
 
 [35] Appellant faults trial counsel for failing to "confirm" that the jury's instruction packet was complete. This is not exactly a record-based claim, since we simply do not know what counsel did, or whether the packet included the instruction discussed in Proposition XI. In any event, such an instruction was not required in the first place. See discussion of Proposition XI.
 
 
 
 [36] Appellant also faults trial counsel for not filing a proper motion for continuance. As discussed in Proposition II, the trial court considered a continuance as a possible option, so we find no prejudice in failing to file a separate request.
 
 
 
 [37] To support his attacks on trial counsel's performance, Appellant also submits a revised report compiled by his fire expert, Smith, who was retained again on appeal to review information which simply was not available to him before trial. Because Smith's revised report includes opinions based on this post-trial information, we cannot consider it here, as it has no logical bearing on what trial counsel knew or did at the time of trial. We will revisit Smith's revised report in our discussion of Appellant's Motion for New Trial.
 
 
 
 [38] Appellant relies on Garrison, 2004 OK CR 35, ¶¶ 150-169, 103 P.3d at 616-620 for the importance of securing alternative means of presenting testimony when the original witness selected for the task cannot attend. Garrison was a capital murder case, but the similarities with this case end there. Garrison involved a "unique and utterly bizarre" set of circumstances (id. at ¶ 166, 103 P.3d at 619) regarding appellate counsel's efforts (or lack thereof) at an evidentiary hearing to determine whether trial counsel effectively handled the case for mitigation of punishment. While Garrison's crime and criminal past were despicable, the circumstances of his upbringing were equally "horrendous," id. at ¶ 167, 103 P.3d at 619, and may have explained his sociopathic conduct and persuaded the jury not to sentence him to death. Appellate counsel had retained an expert to show what kind of mitigation evidence trial counsel should have presented to the jury. The expert was unable to attend the evidentiary hearing due to health reasons. Appellate counsel declined the trial court's offer to continue the hearing, declined to present any of the fifteen or so other in-state witnesses who could corroborate the expert's investigation (claiming their testimony would make no sense without the expert's) -- and even declined to cross-examine defendant's trial counsel about his own efforts to prepare a mitigation case. Id. at ¶¶ 160-65, 103 P.3d at 618-19. Thus, the trial court (the fact-finder in that situation) had no evidence on which to fairly evaluate the claim that trial counsel was ineffective -- which was the purpose for remanding the case in the first place. We found appellate counsel's intransigence "completely unacceptable" (id. at ¶ 164, 103 P.3d at 619), and ultimately vacated Garrison's death sentence, because we lacked confidence that the death sentence was arrived at fairly. Garrison is markedly distinguishable from the instant case. Appellate counsel in Garrison utterly failed to support his claim that trial counsel's mitigation case was lacking, despite available evidence. Here, the defense expert merely critiqued the conduct of the State's fire investigator; his report provided talking points for defense counsel's cross-examination of the State's investigator, and counsel apparently made good use of it. See Proposition II.
 
 
 
 [39] Appellate defense counsel dismisses Dr. Garner's conclusions about the lack of Fetal Alcohol Syndrome evidence in this case because Garner was "not even" a psychologist. We find this assertion somewhat disingenuous. First, appellate counsel counters those opinions with an affidavit from a trial-team defense investigator (also not a psychologist). More important, however, is that Dr. Russell (who was a psychologist) reached the same conclusion as Dr. Garner. Dr. Garner had considerable experience in social work and was a capital mitigation specialist. The information that mitigation specialists compile and relate to juries should not be underestimated. See e.g. Marquez-Burrola v. State, 2007 OK CR 14, ¶ 60, 157 P.3d 749, 767-68. Garner worked for several years in a psychiatric setting and was qualified to diagnose mental illness. She was not a neurologist, but she had extensive experience in observing human behavior and detecting possible cognitive problems.
 
 
 
 [40] Among the affidavits Appellant presents is one from Dr. Russell, who states that she now believes "neuropsychological testing was warranted" in this case to "fully assess and explain [Appellant's] true level of functioning." It is not clear if Dr. Russell felt that way at the time of trial, or felt that any findings in that regard would "move the ball" as far as Appellant's moral blame, but her testimony at least suggests she did not.
 
 
 
 [41] We must also keep in mind that the jurors (assuming none were neuropsychologists) were able to consider Appellant's cognitive abilities, from a layperson's point of view, through his extensive video interview with Detective Saulsberry and by observing his demeanor and interactions with counsel throughout the trial.
 
 
 
 [42] Overruled on other grounds, Blonner v. State, 2006 OK CR 1, 127 P.3d 1135.
 
 
 
 [43] Timely motions for new trial based on new evidence are filed with this Court, not the trial court, if a direct appeal is pending. Rule 2.1(A)(3), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch.18, App. (2019).
 
 
 
 [44] Appellant asks this Court to excuse the untimely filing by pointing out that it took some time to compile the appeal record. The post-trial evidentiary hearings did give rise to a potential Brady claim, which we have already addressed under Rule 3.11(A) of our Rules. But as for the additional physical evidence found at the scene, the affidavit from Appellant's investigator indicates that it was found quite inadvertently, while the investigator was searching the rubble of Appellant's home for a family photo album as part of her mitigation investigation. Any delays in perfecting this appeal simply had no bearing on Appellant's ability to locate this evidence.
 
 
 
 [45] On September 26, 2018, Appellant filed a request to remand this case, once again, to the district court. Appellate counsel claims that a court reporter recently found State's Exhibit 9, Appellant's cigarette lighter, in her work materials. This exhibit was offered at trial; a photograph was substituted for inclusion in the appeal record, and the lighter apparently went missing thereafter. See Proposition III. We also note that defense counsel objected to the introduction of the lighter at trial. See Proposition VIII. We are unsure what Appellant now believes the relevance of this evidence to be, but treat it as "newly discovered evidence" for present purposes, and likewise DENY the request to remand for the reasons discussed above regarding Appellant's Motion for New Trial.
 
 
 

 
 LUMPKIN, JUDGE: CONCURRING IN RESULT
 
 
 ¶1 I concur in the results reached but write separately to further explain aspects of the analyses set forth in the opinion.
 
 ¶2 As to Proposition II, I note that the references to David Smith's report are taken from a Court Exhibit, i.e., a copy of Smith's report to defense counsel. The Exhibit was not a part of the evidence presented to the jury. This Court only uses the report for the purpose of determining if the trial judge abused his discretion.
 
 ¶3 Defense counsel's use of Smith's report to cross-examine the State Fire Marshal's Investigator, Tony Rust, was most likely more effective than having Smith testify in person at the trial. Smith could have been readily impeached at trial for not having visited the site of the fire, not examining the physical evidence, and failing to speak with witnesses regarding the fire. Therefore, I agree that the trial court did not abuse its discretion when it refused to grant a mistrial.
 
 ¶4 Appellant's claim under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) in Proposition IV should have been raised in a timely motion for new trial and handled under that statute. Rule 3.11(A), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch. 18, App. (2019) solely allows this Court to supplement the record on appeal with items admitted during proceedings in the trial court but which were not designated or actually included in the record on appeal. Bench v. State, 2018 OK CR 31, ¶¶ 186-87, 431 P.3d 929, 974; McElmurry v. State, 2002 OK CR 40, ¶ 167, 60 P.3d 4, 36 (holding Rule 3.11(B) strictly limits supplementation under Rule 3.11(A) to matters which were presented to the trial court). The Court should not consider the extra-record evidence attached to Appellant's Rule 3.11 application in determining his Brady claim. These ex parte attachments have neither been properly identified nor subjected to cross examination. As such the Court cannot use the attachments as substantive evidence regarding the issues raised. Warner v. State, 2006 OK CR 40, ¶ 14, 144 P.3d 838, 858 overruled on other grounds Taylor v. State, 2018 OK CR 6, 419 P.3d 265. Instead, the attachments only go to the determination whether an evidentiary hearing is required. Id., 2006 OK CR 40, ¶ 14 n.3, 144 P.3d at 858 n. 3.
 
 ¶5 The attachments to Appellant's motion should have been raised in a motion for new trial or as part of his ineffective assistance of counsel argument. See 22 O.S.2011, §§ 952-953. By attempting to raise the issue in the present manner, Appellant attempts to skirt the rules for deciding a motion for new trial. See Rule 2.1(A), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch. 18, App. (2019). Since Appellant has not argued for supplementation with items admitted during proceedings in the trial court but which were not designated or actually included in the record on appeal, his request for supplementation under Rule 3.11(A) must be denied.
 
 ¶6 Those actions which occurred post-trial cannot support a Brady claim since the prosecutor could not have known or discovered them prior to the trial. Because nothing within the record establishes that the prosecution suppressed evidence that was exculpatory or favorable to Appellant, Proposition IV is properly denied. United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); Brady, 373 U.S. at 87, 83 S.Ct. at 1196.
 
 ¶7 As to Appellant's request to supplement the record under Rule 3.11(B), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch. 18, App. (2019), I note that this rule is neither a ground for relief nor part of the analysis under Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). Instead, Rule 3.11(B) is only used to determine whether an evidentiary hearing is required and should not be considered in any manner regarding the substantive issue raised. Bench, 2018 OK CR 31, ¶¶ 223-24, 4131 P.3d at 981; Bland v. State, 2000 OK CR 11, ¶ 115, 4 P.3d 702, 731. The 3.11 proffered evidence should not be intermixed with the substantive evidence in the record as it is only for the purpose of deciding if an evidentiary hearing is required. Id. Appellant has not shown this Court by clear and convincing evidence that there is a strong possibility trial counsel was ineffective, thus, his request for an evidentiary hearing is properly denied. Bench, 2018 OK CR 31, ¶ 188, 431 P.3d at 974.
 
 ¶8 In addressing Proposition XIII, the opinion utilizes the acronym "HAC" to discuss the "especially heinous, atrocious, or cruel" aggravating circumstance. 21 O.S.2011, § 701.12(4). "I continue in the belief that it is inappropriate to utilize an acronym to deal with the serious nature of an aggravating circumstance." Berget v. State, 1991 OK CR 121, ¶ 1, 824 P.2d 364, 378 (Lumpkin, V.P.J., concurring in results). This Court should refrain from colloquialisms which denigrate the gravity of the issue presented for our decision.
 
 ¶9 Finally, the Opinion recounts that we cannot consider Appellant's Motion for New Trial because it was filed out of time. However, the Opinion did consider these circumstances in Proposition IV on the merits by wrongly admitting the ex parte affidavits. Those affidavits should not have been considered on the merits. Instead, the affidavits should have only been considered as part of the motion for new trial and for the limited purpose of determining if an evidentiary hearing was required. Bland, 2000 OK CR 11, ¶ 115, 4 P.3d at 731 ("If the items are not within the existing record, then only if they are properly introduced at the evidentiary hearing will they be a part of the trial court record on appeal.").
 






 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Court of Criminal Appeals Cases
 Cite
Name
Level

 1991 OK CR 64, 825 P.2d 621, DUVALL v. STATE
Discussed
 1991 OK CR 121, 824 P.2d 364, BERGET v. STATE
Discussed
 1992 OK CR 23, 829 P.2d 984, STILES v. STATE
Discussed
 1992 OK CR 45, 867 P.2d 1289, ELLIS v. STATE
Discussed
 1993 OK CR 15, 850 P.2d 328, PICKENS v. STATE
Discussed
 1994 OK CR 56, 887 P.2d 290, PARKER v. STATE
Discussed at Length
 1995 OK CR 34, 899 P.2d 635, JONES v. STATE
Discussed
 1995 OK CR 44, 902 P.2d 1092, FREDERICK v. STATE
Discussed
 1995 OK CR 74, 909 P.2d 92, ROMANO v. STATE
Discussed at Length
 1977 OK CR 304, 572 P.2d 233, BAKER v. STATE
Discussed at Length
 2001 OK CR 5, 21 P.3d 1047, 72 OBJ 858, BLACK v. STATE
Discussed
 2001 OK CR 24, 31 P.3d 1046, 72 OBJ 2622, WILLIAMS v. STATE
Discussed
 2002 OK CR 32, 54 P.3d 556, MURPHY v. STATE
Discussed
 2002 OK CR 40, 60 P.3d 4, McELMURRY v. STATE
Discussed
 2004 OK CR 1, 84 P.3d 731, HARRIS v. STATE
Discussed
 2004 OK CR 19, 89 P.3d 1124, DEROSA v. STATE
Discussed
 2004 OK CR 31, 100 P.3d 1017, DODD v. STATE
Discussed
 2004 OK CR 35, 103 P.3d 590, GARRISON v. STATE
Discussed at Length
 2006 OK CR 1, 127 P.3d 1135, BLONNER v. STATE
Discussed
 2006 OK CR 19, 139 P.3d 907, HOGAN v. STATE
Discussed
 2006 OK CR 34, 142 P.3d 437, CODDINGTON v. STATE
Discussed
 2006 OK CR 40, 144 P.3d 838, WARNER v. STATE
Discussed at Length
 2006 OK CR 45, 146 P.3d 1149, JACKSON v. STATE
Discussed at Length
 2006 OK CR 46, 147 P.3d 245, STOUFFER v. STATE
Discussed
 2007 OK CR 14, 157 P.3d 749, MARQUEZ-BURROLA v. STATE
Discussed
 2007 OK CR 17, 158 P.3d 467, WOOD v. STATE
Discussed
 2007 OK CR 28, 164 P.3d 1103, HARRIS v. STATE
Discussed
 2007 OK CR 34, 168 P.3d 185, MALONE v. STATE
Discussed at Length
 2010 OK CR 6, 230 P.3d 888, SIMPSON v. STATE
Discussed at Length
 2010 OK CR 8, 232 P.3d 467, MARSHALL v. STATE
Discussed
 2010 OK CR 14, 235 P.3d 640, MITCHELL v. STATE
Discussed
 2010 OK CR 21, 239 P.3d 156, FLOREZ v. STATE
Discussed at Length
 2010 OK CR 23, 241 P.3d 214, CUESTA-RODRIGUEZ v. STATE
Discussed at Length
 2011 OK CR 6, 248 P.3d 918, HARMON v. STATE
Discussed at Length
 2011 OK CR 17, 254 P.3d 684, CODDINGTON v. STATE
Discussed
 2011 OK CR 29, 268 P.3d 86, DAVIS v. STATE
Discussed
 2011 OK CR 30, 267 P.3d 114, POSTELLE v. STATE
Discussed at Length
 2013 OK CR 1, 293 P.3d 198, MALONE v. STATE
Discussed
 2013 OK CR 11, 313 P.3d 934, MILLER v. STATE
Discussed
 2017 OK CR 10, 400 P.3d 834, BOSSE v. STATE
Discussed
 2017 OK CR 26, 408 P.3d 209, BARNES v. STATE
Discussed
 2018 OK CR 6, 419 P.3d 265, TAYLOR v. STATE
Discussed at Length
 2018 OK CR 19, 422 P.3d 788, BRAMLETT v. STATE
Discussed
 2018 OK CR 31, 431 P.3d 929, BENCH v. STATE
Discussed at Length
 2000 OK CR 11, 4 P.3d 702, 71 OBJ 1304, Bland v. State
Discussed at Length
 1997 OK CR 35, 942 P.2d 736, CLEARY v. STATE
Discussed at Length
 1997 OK CR 64, 947 P.2d 1090, 68 OBJ 3623, Hooper v. State
Discussed
 1997 OK CR 71, 951 P.2d 98, 68 OBJ 3891, Gilbert v. State
Discussed
 1999 OK CR 15, 980 P.2d 1081, 70 OBJ 1223, Short v. State
Discussed
 1999 OK CR 21, 983 P.2d 498, 70 OBJ 1566, Alverson v. State
Discussed
 1999 OK CR 33, 984 P.2d 813, 70 OBJ 2402, Martinez v. State
Discussed
 1985 OK CR 114, 706 P.2d 912, OWENS v. STATE
Discussed
Title 12. Civil Procedure
 Cite
Name
Level

 12 O.S. 668, Procedure for Motion for Continuance
Cited
 12 O.S. 2404, Character Evidence Not Admissible to Prove Conduct - Exceptions - Other Crimes
Cited
 12 O.S. 2602, Lack of Personal Knowledge
Cited
 12 O.S. 2801, Definitions
Discussed
 12 O.S. 2901, Requirement of Authentication or Identification
Cited
Title 21. Crimes and Punishments
 Cite
Name
Level

 21 O.S. 13.1, Required Service of Minimum Percentage of Sentence - Offenses Specified
Cited
 21 O.S. 142A, Short Title
Cited
 21 O.S. 142A-1, Definitions
Discussed at Length
 21 O.S. 701.7, Murder in the First Degree
Cited
 21 O.S. 701.10, Sentencing Proceedings for First Degree Murder - State Seeking Death Penalty
Cited
 21 O.S. 701.11, Jury Instructions for Sentencing - Aggravating Circumstances in Jury and Nonjury Cases
Cited
 21 O.S. 701.12, Aggravating Circumstances
Discussed at Length
 21 O.S. 701.13, Review of Death Penalty Sentence
Cited
Title 22. Criminal Procedure
 Cite
Name
Level

 22 O.S. 831, Order of Trial
Cited
 22 O.S. 893, What Jury May Take With Them Upon Retirement for Deliberation
Cited
 22 O.S. 952, Grounds for Granting New Trial
Cited
 22 O.S. 953, Time for Applying for New Trial - Limitations
Cited


 
 








 
 
 
 

 
 

 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA